UNITED STATES of America, Appellee,

v.

Francis SHEERAN, Appellant.

No. 82–1026.

United States Court of Appeals,
Third Circuit.

Argued Oct. 19, 1982.

Decided Jan. 24, 1983.

Rehearing and Rehearing In Banc · Denied Feb. 16, 1983.

Certiorari Denied May 16, 1983.

See 103 S.Ct. 2095.

Glenn A. Zeitz (argued), Philadelphia, Pa., Raymond W. Cobb, Wilmington, Del., for appellant.

Joseph J. Farnan, Jr., U.S. Atty., D. Del., Wilmington, Del., Frank J. Marine (argued), Dept. of Justice, Kenneth F. Noto, Washington, D.C., Ronald G. Cole, Sp. Atty., Dept. of Justice, Philadelphia, Pa., for appellee.

Before WEIS and BECKER, Circuit Judges, and CAHN,* District Judge.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Francis Sheeran, president of a union local, appeals from a judgment of sentence following his conviction by a jury. Sheeran was found guilty of conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d) (1976); participating in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) (1976);[1] receiving illegal benefits (two counts), in violation of the Taft-Hartley Act, 29 U.S.C. § 186(b)(1) & (d) (1976); and committing mail fraud (seven counts), in violation of 18 U.S.C. § 1341 (1976).[2] This Court has jurisdiction under 28 U.S.C. § 1291 (1976) (amended 1982).

Appellant was tried on an indictment that named as co-defendants Eugene Boffa, Sr., Robert Boffa, Sr., Louis Kalmar, Chandler Lemon, David Mishler, and Robert Rispo. These men all were connected, in one form or another, with the business of labor leasing: they furnished labor—in this case, truck drivers—to various employers who did not wish to hire their own workers or to negotiate contract terms with the workers' collective-bargaining representative. The indictment charged the defendants with engaging in a series of labor-racketeering schemes allegedly effected mainly by switching the labor-leasing contracts at various industrial plants from companies controlled by the co-defendants to other companies that were ostensibly independent but that in fact were also controlled by appellant's co-defendants (principally the Boffas) while covering up this control. According to the indictment, the switches resulted in a loss of wages and benefits to the employees of the co-defendants' labor-leasing companies when the contracts under which they worked were terminated so that the co-defendants could obtain new, more favorable leasing contracts involving their other labor-leasing companies. The co-defendants also allegedly made payoffs to appellant, the president of Teamsters' Union Local 326, in Wilmington, Delaware, whose members were employees of the labor-leasing companies in question, thus obtaining appellant's cooperation and acquiescence in the scheme and avoiding difficulties with the union.

On the basis of these factual allegations, the indictment charged the defendants with: (1) defrauding the employees of several labor-leasing companies of their right to economic benefits guaranteed by section 7 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 157 (1976); (2) defrauding the employees of their contractual right to wages and benefits; (3) defrauding the employees of their right to the loyal, faithful and honest services of appellant, in his capacity as president of their union, Teamsters' Local 326; (4) making payoffs to appellant in exchange for assurances of labor peace and assistance in obtaining contracts; and (5) obstructing justice by supplying altered documents to a grand jury.

---

* Honorable Edward N. Cahn, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. 18 U.S.C. §§ 1962(c) and (d) (1976) are parts of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 (1976 & Supp. V 1981), which, *inter alia,* makes it unlawful for a person to conduct or conspire to conduct the affairs of an "enterprise" by means of a "pattern of racketeering activity."

2. Appellant was sentenced to: concurrent 18-year terms of imprisonment on the RICO and RICO-conspiracy convictions; consecutive one-year terms of imprisonment on the two Taft-Hartley convictions; and consecutive 30-month terms of imprisonment on each of the seven mail-fraud convictions (totalling 17½ years). The Taft-Hartley and mail-fraud sentences were to be served concurrently with those imposed on the racketeering counts. In addition, appellant was fined $27,000—$5,000 for each of the two racketeering convictions and each of the two Taft-Hartley convictions, and $1,000 for each of the seven mail-fraud convictions. Finally, pursuant to the RICO forfeiture provision, 18 U.S.C. § 1963(a) (1976), appellant was required to forfeit his position as president of Teamsters' Union Local 326.

Appellant's case was severed from that of the co-defendants,[3] who were tried first and convicted.[4] The co-defendants then appealed, and their convictions were affirmed in part and vacated in part in an opinion filed on August 25, 1982, *United States v. Boffa,* 688 F.2d 919 (3d Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3394 (U.S. Nov. 1, 1982) (No. 82–814). Because *Boffa's* holding requires that we vacate appellant's sentence and remand for further consideration, we take up first the impact of *Boffa* on this case.

## I.

*Boffa* involved a number of challenges to the indictment and to the sufficiency of the evidence, although we devoted most of our attention to the contention of appellant's co-defendants that Congress did not intend to impose criminal penalties on those who commit unfair labor practices by violating the rights guaranteed under section 7 of the NLRA. We agreed with the co-defendants' argument and held that the mail-fraud statute, 18 U.S.C. § 1341, does not apply to schemes to defraud people of rights derived exclusively from section 7. We noted that rights created by section 7 are part of a comprehensive federal labor policy that vests administrative and punitive powers exclusively in the NLRB. *See Boffa, supra,* 688 F.2d at 925–31.

In contrast, we also held in *Boffa* that Congress did intend the mail-fraud statute to encompass the counts of the indictment alleging that the co-defendants had defrauded the employees of the labor-leasing companies of both their rights under an existing contract and the loyal and faithful

services of their union representative. *See id.* at 930–31. By definition, the right to benefits under an existing contract is rooted in contract law, and the right to the loyal and faithful service of a union representative derives from the duty imposed on such a representative by section 501 of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 501(a) (1976). Unlike section 7, neither contract law nor section 501 is part of a self-contained and exclusive remedial scheme.

Having found that the Government's mail-fraud theories were only partially valid, and unable to tell whether the jury had considered the invalid theory in reaching its verdict, we reversed the mail-fraud convictions as well as those RICO convictions that depended on mail fraud for their predicate acts of racketeering and remanded for a new trial on the valid mail-fraud theories. We affirmed the remaining RICO convictions.[5]

Appellant's conviction was based on the same indictment that was considered in *Boffa.* Because we are bound by the *Boffa* decision, *see* United States Court of Appeals for the Third Circuit, Internal Operating Procedures ch. VIII, § C; *see also United States v. American Bag & Paper Corp.,* 609 F.2d 1066, 1067 n. 3 (3d Cir.1979) (determination by prior panel is law of the case and binds future panels), we are obliged to reverse appellant's mail-fraud convictions (counts 5–11) and remand for a new trial based on the two valid theories of mail fraud. Appellant's RICO convictions (counts 1 and 2), however, are predicated on at least two acts of racketeering that are independent of the mail-fraud offenses:[6] by

---

3. Before trial, Rispo entered a plea of guilty to Count I pursuant to a plea agreement with the Government. Mishler's case was severed from this action and ultimately was dismissed.

4. The evidence adduced at appellant's separate trial overlapped substantially with that introduced during the co-defendants' earlier trial.

5. The predicate acts for these convictions were Taft-Hartley violations and obstruction of justice.

6. The substantive and conspiracy provisions of RICO proscribe the conducting of the affairs of an enterprise through a "pattern of racketeering activity." 18 U.S.C. § 1962(c), (d) (1976). The Act defines a "pattern of racketeering activity" as "at least two acts of racketeering activity [as defined by 18 U.S.C. § 1961(1)], one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5) (1976 & Supp. V 1981).

special verdict, the jury found that appellant had committed numerous predicate racketeering acts involving violations of section 302 of the Taft-Hartley Act, 29 U.S.C. § 186 (1976 & Supp. V 1981).

Although, in view of the foregoing, we see no warrant for reversing appellant's RICO convictions, we do think it appropriate to remand for resentencing. While appellant's sentence and the judgment of forfeiture could have been premised on the numerous predicate racketeering acts that remain unaffected by our resolution of the mail-fraud issue, we note that we vacated the sentences imposed on Eugene Boffa for RICO convictions because the "district court may have considered the mail fraud predicate acts in sentencing. . . ." *See Boffa, supra,* 688 F.2d at 939. We also vacated the judgments of forfeiture against defendants Eugene Boffa and Louis Kalmar to permit the district court to determine whether disposition of the appeal "in any way affects [the district court's] prior forfeiture order." *Id.* Like the *Boffa* court, we cannot be sure whether the district court sentenced appellant on the basis of the mail-fraud predicate acts or whether the disposition of this appeal would in any way affect that court's judgment of forfeiture. We therefore will remand for resentencing and for reconsideration of the judgment of forfeiture. We note that the Government, in response to our requests for comments concerning the effect of *Boffa* on this appeal, agreed that this disposition would be appropriate.

## II.

This disposition does not end the matter, however, for appellant has raised a number of claims of trial error that would, if successful, require us to grant a new trial rather than simply remand for resentencing on the remaining counts. Insofar as some of the same arguments were rejected in *Boffa,*[7] we must reject them here.[8] Appellant, however, has advanced a number of arguments that are peculiar to his case, and we now turn to these claims.

## A.

■ Appellant contends that he should be granted a new trial because the district court erroneously admitted into evidence the prejudicial testimony of Government witnesses Robert DeWan and Travis Dumas. DeWan, an alleged co-conspirator, operated Countrywide Personnel ("CWP") of California, the company to which the defendants switched Crown Zellerbach's labor-leasing contract. DeWan testified that, during the course of the conspiracy, he had issued checks drawn on the account of CWP of California, at Eugene Boffa's direction, to pay for the lease of a car by Leroy Noones, a union official in Oakland, California. Dumas, a Florida union representative, testified that, during the course of the conspiracy, Robert Boffa had offered him various benefits through CWP of Miami, another labor-leasing company controlled by the Boffas and involved in the scheme, in exchange for his assistance in obtaining labor-leasing contracts with companies whose employees were represented by Dumas' union.[9]

The district court ruled DeWan's testimony admissible to show Eugene Boffa's con-

---

7. Pursuant to Fed.R.App.P. 28(i), appellant has adopted the arguments of his co-defendants on appeal.

8. These claims of error include: (1) the charge to the jury on the elements of RICO conspiracy; (2) the failure to charge the jury that a Taft-Hartley violation is a lesser included offense of a substantive RICO violation; and (3) the use and form of special interrogatories. Essentially the same charge and interrogatories were used in both trials. To the extent that there are any significant variations, we note our independent endorsement of the result reached in *Boffa.*

9. The benefits offered to Dumas included an automobile to be leased at a nominal rate through CWP of Miami, cash payments, and jobs for Dumas' children. Dumas rejected Boffa's offer. Dumas also testified that Boffa had told him that he had given a new Cadillac to John Greeley, an International Brotherhood of Teamsters official, who was apparently unconnected with the labor leasing companies involved in this case.

trol over CWP of California as well as the conspirators' intent and mode of operation; when the evidence was received, the court gave a cautionary instruction appropriately limiting the jury's consideration of the evidence.[10] The court also made a finding pursuant to Fed.R.Evid. 403 that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

Similarly, the court found that Dumas' testimony was "highly relevant for the purpose of showing . . . Robert Boffa's control over the operations of Countrywide Personnel of Miami . . . [and also for showing] intent, mode or plan of operation and absence of mistake or accident." The district court gave a similar cautionary instruction[11] and again found expressly that the probative value of Dumas' testimony was not substantially outweighed by the danger of unfair prejudice.

In both instances, then, the challenged testimony was offered only to show that co-defendants (and co-conspirators) Eugene and Robert Boffa exercised control over the labor-leasing companies to which the contracts were switched and to reveal the Boffas' intent as well as the nature of their scheme or plan. Proof of these elements was essential to the establishment of the fraud against the leasing companies' employees—the fraud which formed the basis of the mail-fraud counts. The evidence also

was probative of the substantive RICO and RICO-conspiracy charges for which mail fraud constituted a predicate offense.

Appellant concedes these points but argues that the Government's proof of control was sufficiently strong that the challenged evidence need not have been introduced at all. The probative value of this evidence, he contends, was marginal and was outweighed by the unfair prejudice of speculative inferences. To support this conclusion, appellant points out that he never had dealt with Robert Boffa and that neither Dumas nor DeWan testified about any dealings with appellant or about his responsibility for the crimes charged. Moreover, appellant asserts, the establishment of the Boffas' pattern or plan was not probative of the crimes with which appellant himself was charged; nor was the Boffas' intent an issue in appellant's own trial. The testimony, submits appellant, thus was minimally relevant, while its prejudicial impact was enormous, inviting an inference that appellant must have been bribed by the Boffas, as other union officials had been bribed by them.

We believe that the district court acted properly in admitting the challenged evidence. First, the evidence was probative of the crimes charged in the indictment. At the heart of the indictment was the charge that the co-defendants, in derogation of the

---

**10.** The court stated:

Members of the jury, you have now heard certain evidence that Mr. [Eugene] Boffa, who is a named defendant in this case but is not being tried here at this stage, through Mr. DeWan made certain payments to a Labor Union official in California. You cannot use that testimony as a similar act that that [sic] transpired with the defendant who is on trial here. That evidence is only as [sic] limited to the mode of operation of Mr. Boffa who is alleged to have been in conspiracy with the defendant on trial here. So it is admitted for that limited purpose.

Appellant's Appendix at 321a.

**11.** The court stated:

Before we start, this Witness is going to be giving testimony which is limited in nature and which you must consider it in the limited respect which I'll explain to you now.

Testimony that a Defendant named in the indictment may have committed at some other time in [sic] acts similar to an act alleged in the indictment is not proof that a Defendant, in fact, committed any act alleged in the indictment. . . . Evidence, however, that a Defendant named in the indictment committed an act similar to an act alleged in the indictment may be considered by the jury for certain limited purposes. Such evidence may be considered for the purpose of showing motive, intent, plan, or method of operation, or absence of a mistake or an accident with respect to the offenses charged.

The only crimes which you are to consider are those which are charged in the indictment. You're not to consider whether the Defendant is guilty or innocent of any other alleged crime other than those that are charged.

Appellant's Appendix at 262a.

economic rights of their companies' employees (who ended up with lower wages and lesser benefits), fraudulently switched labor-leasing contracts at various plants from companies controlled by the co-defendants to other companies that ostensibly were independent but that in fact were also controlled by the co-defendants. The Government thus was required to establish that the co-defendants actually controlled the various transferee companies. Testimony that Eugene Boffa directed DeWan to issue checks on the account of CWP of California to pay bribes to a union official, and evidence that Robert Boffa offered to pay similar bribes to a union official through CWP of Miami, evinced the Boffas' control over those companies. Moreover, the conspiracy charged in the indictment also embraced the bribing of union representatives to obtain their cooperation in the labor-leasing-company switches. Evidence that Eugene Boffa, Robert DeWan, and Robert Boffa offered such bribes to various union representatives was relevant to show the conspirators' intent and the nature of their scheme or plan.

■ Contrary to appellant's contention, such evidence does not become irrelevant merely because it is not probative of appellant's own personal involvement. It is well established that acts in furtherance of a conspiracy, committed by co-conspirators not on trial, are admissible against a defendant even though that defendant did not participate in those particular acts. *See, e.g., United States v. Wolfson,* 634 F.2d 1217, 1219–20 (9th Cir.1980); *United States v. Davis,* 623 F.2d 188, 191–92 (1st Cir.1980); *United States v. Salazar,* 485 F.2d 1272, 1276 (2d Cir.1973), *cert. denied,* 415 U.S.

985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974); *United States v. Cole,* 365 F.2d 57, 61 (7th Cir.1966), *cert. denied,* 385 U.S. 1027, 87 S.Ct. 741, 17 L.Ed.2d 674 (1967). Similarly, evidence showing the existence of a conspiracy, its mode of operation, and the other conspirators' participation is admissible at the trial of a severed co-conspirator who was not involved in such conduct. *See United States v. Etley,* 574 F.2d 850, 852–53 (5th Cir.) (appellants tried separately from co-conspirator whose acts had been introduced), *cert. denied,* 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978); *cf. Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946) (motive or intent may be proved by acts or declarations of only some of the conspirators in furtherance of common objective, and all members are responsible even if only one member actually committed the act).

It may well be that the Government had sufficient evidence to prove the Boffas' control of the leasing companies without having to introduce the testimony of DeWan and Dumas, but we cannot say that the Government should have been foreclosed from presenting the strongest possible case, at least in the absence of a concession by the defendant.[12] Moreover, the district court twice gave a cautionary instruction regarding the limited use of the evidence, first when that evidence was admitted and again in the charge to the jury. Under the circumstances, the evidence was appropriately "fenced in," and the district court acted well within its discretion in concluding under Fed.R.Evid. 403 that the probative value of the challenged evidence exceeded its prejudicial effect.[13] Finally, the

12. Appellant never conceded the Boffas' control of the labor-leasing companies even though he claims to have challenged only the existence of his knowledge of that control. Absent such a stipulation by appellant, the Government was entitled to introduce evidence probative of that fact. Although "[a]n offer to stipulate does not *automatically* mean that the fact may not be proved instead, as long as the probative value of the proof still exceeds the prejudicial effect, taking into account the offer to stipulate," *United States v. Provenzano,* 620 F.2d 985, 1003–04 (3d Cir.1980) (emphasis added), we

have held that evidence admissible in the absence of such a concession sometimes should not be admitted where the defendant has offered "a suitable stipulation . . . that would convey the same fact," *id.* at 1004.

13. Appellant relies on a number of cases, including *United States v. Bocra,* 623 F.2d 281 (3d Cir.1980); *United States v. Pantone,* 609 F.2d 675 (3d Cir.1979); *United States v. Forsythe,* 594 F.2d 947 (3d Cir.1979); and *United States v. McCann,* 589 F.2d 1191 (3d Cir.1978), none of which is apposite here.

overwhelming evidence against appellant would make any putative error harmless at most [14] and insufficient on this record to justify our granting a new trial.[15]

### B.

■ Appellant also alleges that he was deprived of a fair trial because the Government introduced evidence, through the testimony of Charles Allen, that appellant's co-defendants had already been convicted of the same crimes.[16] Allen, however, stated merely that he had testified in two trials that had resulted in guilty verdicts; he did not identify the convicted parties. Moreover, even if Allen *had* testified that the co-defendants had been convicted at a previous jury trial in which he testified, the admission of his testimony would not be grounds for reversal. The entire subject of Allen's testimony at the prior trial was first introduced when defense counsel sought to impeach Allen's credibility by showing that he had testified at trials (including one involving appellant) that had resulted in *acquittals,* the intended implication being that the jury should not find Allen credible because juries in other cases in which he had testified had acquitted the defendants. The district court thus properly found that appellant had "opened the door" and that the Government therefore should be allowed to attempt to rehabilitate Allen by eliciting evidence that he testified in previous trials resulting in convictions. The district court's cautionary instructions also preclude us from finding any reversible error.

---

**14.** *Cf.* Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

**15.** The operation of the labor-leasing scheme is generally described in the *Boffa* opinion; hence, we need not repeat that description here. The Government used numerous witnesses and various kinds of documentary evidence at appellant's trial to present the workings of the scheme. The most dramatic evidence of appellant's role came from the testimony of Robert Rispo, a convicted co-conspirator, and of Charles Allen, a Government informant who was "wired" by the FBI, as well as from tape-recordings made of conversations among Allen, appellant, and co-defendant Eugene Boffa. The testimony and the tapes demonstrated appellant's knowing and full participation in the scheme to defraud members of the union by appellant's acquiescing in labor-leasing switches that resulted in reduced wages and benefits for those union members able to obtain employment with the substituted labor-leasing company and in unemployment for still other employees. In one instance, another union even replaced Teamsters' Local 326 as collective-bargaining representative for the employees of the Boffa-controlled labor-leasing company. The Government also adduced circumstantial evidence of communications between appellant and Eugene Boffa with respect to the particular "switches" involved. This evidence revealed that appellant had agreed to the new contract terms on behalf of Local 326 even before the switches were effected.

There was clear evidence that appellant had received payoffs from Eugene Boffa in return for his participation in the switches. Rispo testified that appellant had admitted that he was receiving the free use of automobiles and a percentage of the profits from the labor-leasing contracts. Rispo also testified that he personally had witnessed some of the cash payoffs to appellant by Eugene Boffa. Allen testified to similar effect, and both Allen's testimony and the conversation on the tapes established that appellant was receiving a percentage of Boffa's profit on the labor-leasing contracts. While the precise amount that appellant received never was firmly established, a 5% payoff was mentioned at several points, and, at another point, when a proposal for a new arrangement was being discussed, appellant commented that "Boffa gets half and I get half."

Many witnesses in addition to DeWan, Dumas, Rispo, and Allen testified about the workings of the scheme, the mechanics of the automobile-leasing payoffs, and the impact of the switches. *Inter alia,* the Government also produced as witnesses the personnel of trucking companies who did labor-leasing business with Boffa-controlled labor-leasing companies, white-collar employees of two of those leasing companies, an FBI financial analyst, and a number of truck drivers who had suffered economic disadvantage as a result of the labor switches and who identified employment-termination notices received by mail that did not reveal the true state of affairs about the labor switches, thus establishing that the fraud had been executed with the aid of the mails. The documentary evidence offered with respect to the automobile-lease transactions is fairly summarized in Part V.B. of the *Boffa* opinion, 688 F.2d at 935–36, and need not be repeated here.

**16.** Allen, a Government informant, testified regarding his tape-recorded conversations with appellant and Eugene Boffa. *See supra* note 15.

## C.

Appellant also contends that the district court erred in failing to instruct the jury regarding appellant's own "theory of defense." In particular, he argues that his receipt of the free monthly use of an automobile over a three-month period constituted a single, rather than a multiple, violation of Taft-Hartley (and thus only a single predicate offense under RICO, which requires at least two predicate acts) and that the jury should have been so charged.[17]

We reject this contention for several reasons. First, *Boffa* addressed and rejected a similar argument by appellant's co-defendants. 688 F.2d at 934–36. Although appellant would have us distinguish this case by focusing on his receipt, rather than on the co-defendant's delivery, of the automobile, appellant's own testimony at trial established that he had made monthly car-lease payments, and *Boffa* specifically held that each monthly payment for the free use of an automobile by appellant was a separate "thing of value" and therefore could constitute a separate Taft-Hartley offense. *Id.* at 934. Second, the jury found by special verdict that appellant had received the free use of three separate automobiles over different periods of time. Thus even under appellant's theory that "the free use of the automobile for the entire period" constitutes a single offense, the evidence still would have established at least three separate offenses.[18] The district court did not err in refusing to charge in accordance with appellant's theory with respect to the car payments; nor are the convictions on the multiple Taft-Hartley counts infirm.[19]

## D.

Finally, appellant argues that he must be granted a new trial on the remaining counts because of prejudicial "spillover effect." In other words, appellant asserts that his Taft-Hartley and RICO convictions should be overturned because: (1) the mail-fraud convictions must be reversed in light of *Boffa;* (2) the bulk of the evidence presented at trial related to mail fraud; (3) the jury's decision on the Taft-Hartley counts was influenced by the unfavorable impression of appellant that the jurors formed from the mail-fraud evidence; and (4) the evidence unrelated to mail fraud was insufficient to support appellant's Taft-Hartley and RICO convictions. In a related "spillover" argument, appellant asserts that the district court's errors in dealing with multiplicity in connection with the car payments require us to reduce the number of racketeering acts charged from thirty-five to four and that "[t]he prejudice of Mr. Sheeran being charged with so many Racketeering Acts is obvious." We have rejected the premise of this latter contention in part II.C.; hence, the argument falls of its own weight. The principal "spillover" argument is equally without merit, and we reject it.

## III.

We will reverse appellant's mail-fraud convictions (counts 5–11) and remand those counts for a new trial. We will affirm appellant's RICO convictions (counts 1 and 2) and Taft-Hartley convictions (counts 3 and 4). We will vacate appellant's sentence on the RICO and Taft-Hartley convictions and remand for resentencing and reconsideration of the judgment of forfeiture.

---

**17.** Appellant raises the same argument in challenging the validity of his multiple Taft-Hartley convictions.

**18.** The jury also found that the sale to appellant of a 1975 Lincoln Continental for substantially less than market value constituted an additional Taft-Hartley-derived racketeering act on appellant's part.

**19.** Appellant's contentions as to "theory of defense" also have a broader compass and resemble those raised by the co-defendants whose appeals we considered in *Boffa.* We there rejected those contentions summarily, 688 F.2d at 939, and we find no greater merit in them here.