

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-20-1994

# United States of America v. Jemal

Precedential or Non-Precedential:

Docket 93-5172

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States of America v. Jemal" (1994). *1994 Decisions*. Paper 52.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/52

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 93-5172
_____

UNITED STATES OF AMERICA,

Appellee

v.

DAVID JEMAL,

Appellant

_____

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Crim. No. 91-00535-02)

_____

Argued: May 12, 1994

Before: BECKER, and LEWIS, Circuit Judges, and
POLLAK, District Judge.[1]

(Filed: June 21, 1994)


RICHARD E. MISCHEL, Esquire (ARGUED)
233 Broadway
New York, NY  10279

Attorney for Appellant


MICHAEL CHERTOFF,
United States Attorney
EDNA B. AXELROD (ARGUED)
JOHN J. FARMER, JR.

_____

[1]Honorable Louis H. Pollak, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.


1

Assistant U.S. Attorneys
Office of the U.S. Attorney
970 Broad Street
Room 502
Newark, NJ  07102

                    Attorneys for Appellee

---

**OPINION OF THE COURT**

---

BECKER, <u>Circuit Judge</u>.

This appeal from a judgment in a criminal case presents an important question under Federal Rule of Evidence 404(b): whether a defendant may, by offering a comprehensive and unreserved stipulation that he possessed the knowledge, intent, motive, opportunity, or other fact sought to be established by Rule 404(b) evidence, prevent the government from putting on evidence of the defendant's prior bad acts. This question arises in a mail fraud case stemming from a "bust-out" scheme allegedly masterminded by defendant David Jemal. Along with co-conspirator Norman Levy, Jemal allegedly started a business (Capital Merchandise), increased its credit rating by fraudulent means, bought goods for resale on credit with no intention of paying the sellers, sold the goods, kept the money, and declared the corporation bankrupt. For this, a jury convicted him of one count of conspiracy to commit mail fraud, 18 U.S.C. § 371, and for six substantive counts of mail fraud, 18 U.S.C. § 1341.

Over Jemal's objections, the district court allowed the government to introduce evidence of Jemal's involvement in prior

2

insurance frauds and bust-outs in order to prove he knew and intended Capital Merchandise to be a bust-out.  Jemal argues that because he indicated his willingness to stipulate to knowledge and intent, the prior bad acts evidence should have been excluded.  Although we agree with Jemal that a district court should generally refuse to admit evidence of a defendant's prior bad acts to show knowledge and intent when the defendant has proffered a comprehensive and unreserved stipulation that he possessed the requisite knowledge and intent (or other fact sought to be established by the prior bad acts evidence), Jemal's offer was not sufficiently comprehensive to remove those issues from this case.  Inasmuch as the Rule 404(b) evidence was otherwise admissible and not subject to exclusion under Federal Rule of Evidence 403, we hold that the district court did not abuse its discretion in admitting the evidence. The judgment of the district court will therefore be affirmed.[2]

I. FACTS AND PROCEDURAL HISTORY

In September 1985, Jemal approached his attorney, Joseph Indick, about incorporating a business for him and a relative.  In November 1985, Jemal began discussing this plan with Levy, his cousin.  In January 1986 he specifically proposed to Levy that they start a "wholesale jobbing business" in the

---

[2]The only other contention advanced by Jemal on appeal -- that it was plain error for the district court to fail to give the jury a cautionary instruction that the guilty plea of Jemal's alleged co-conspirator did not constitute evidence of Jemal's guilt -- is, in light of other instructions the court gave, clearly without merit and does not warrant discussion.

back office of Big Bargain Stores -- one of Jemal's retail stores. He suggested that they buy merchandise and resell it to "mom and pop" retail stores. At the end of January, Jemal informed Levy that he could raise the capital if Levy was willing to "operate the business." They agreed to incorporate the business under the name Capital Merchandise.

Jemal then formed a corporation and asked Levy to be the corporation's president. In March 1986 he brought Levy with him to Indick's office. At the meeting, Levy, but not Jemal, signed corporate by-laws and board resolutions listing Levy as the president, vice-president, treasurer, secretary, and subscriber to the stock of Capital Merchandise. These documents had been backdated to September 23, 1985, which Indick testified was not inappropriate as a means of reflecting the "reality" that Levy had been operating the "corporation" on the dates indicated. Levy also signed a lease, which he said Jemal had prepared, for part of Jemal's premises at 143 Newark Avenue -- a lease backdated to October 22, 1984 and purporting to run from November 1, 1984 to October 31, 1986, although Levy did not move into the office until March, 1986. The lease was purportedly assigned to Capital Merchandise in November 1, 1985.

On March 10, 1986, Levy opened a bank account for Capital Merchandise for which he signed a signature card allowing him to withdraw funds. The next day, according to Levy, Jemal signed an additional signature card with the name "Mike Levy" saying that he "just want[ed] to use that name." Levy told the

4

bank that "Mike" was his brother and would sign for funds in case of emergency.

Levy and Jemal then began to purchase merchandise from wholesalers, substantiating their credit worthiness by stating that they had been in business for a couple of years as evidenced by the backdated lease. But Capital Merchandise needed to establish a more significant credit history in order to begin buying large quantities of merchandise. Thus, Jemal approached Sam Kassin, an acquaintance who had familiarity with bust out schemes and asked for advice on how to inflate the credit history of the corporation. Kassin provided this advice in June 1986, and agreed to write purchase orders for Capital Merchandise. Jemal also approached his acquaintance Richard Beda, told him (according to Beda) that he was "going to make a bust-out" of Capital Merchandise, and asked if he could used Beda's company as a credit reference. Beda agreed and sent out 20 to 40 references indicating that Capital Merchandise's credit was very good.

During this period, Jemal advised Levy to remove his name from the corporate documents "after discussions we had that we were planning to scam the company;" Kassin provided similar advice. In August, although made to look as if it was in July, Levy resigned as director and president of the corporation and inveigled his invalid father Morris Levy to sign the name "Jack Levy" on documents naming Jack Levy the sole shareholder, director, and president of Capital Merchandise. Also in August 1986, Capital Merchandise submitted a credit statement, signed by "Jack Levy", to Dun and Bradsteet. Jemal apparently fabricated

5

the statement to show equities, sales, and profits far above their actual values.

Soon thereafter, according to Levy, Jemal and Levy discussed their strategy of running the corporation into bankruptcy and then satisfying creditors by having a marshal liquidate remaining assets. They began ordering merchandise in large quantities with no intention of paying for it. Levy testified that most orders and sales were made by Jemal. However, Jemal and Levy began feuding, and, after November, Levy's involvement in Capital Merchandise was very limited. In January 1987 Levy received his remaining "payoff" of $5,000, bringing his total compensation to $14,000. Jemal took 80-85% of the income, some of it allegedly for rent. By March 1987 Capital Merchandise was essentially defunct, with the corporate bank account closed for insufficient funds.

Jemal was indicted for engaging in a conspiracy to commit mail fraud, 18 U.S.C. § 371, and for six substantive counts of mail fraud, 18 U.S.C. § 1341. Norman Levy, who was named as a co-conspirator and a co-defendant, pleaded guilty to conspiracy to commit mail fraud. After a jury trial, Jemal was convicted on all counts.

## II. PRIOR BAD ACT TESTIMONY

A. The Evidence and Defendant's Offer to Stipulate

Jemal's defense was essentially that he was an innocent landlord who had no involvement in the bust-out scheme perpetrated by Levy and others. He sought to impeach Levy and

6

the government's other witnesses by demonstrating that they were testifying because of deals they had made with the government, by showing their past tendency to lie, their past crimes, and, with regard to Levy, by his history of drug abuse.

Over continuous objections, the government introduced evidence of prior crimes Jemal had allegedly committed, ostensibly to show Jemal's knowledge of the nature of a bust-out scheme and his intent to perpetrate one. Kassin testified that Jemal had been one of his partners in a bust-out of a store called SBL Trading in 1976 or 1977; Jemal had served as SBL Trading's landlord and had received 25% of the profits. Kassin also testified that he had operated a bust-out in 1979 of which Jemal was aware and from which Jemal had wanted to purchase discounted merchandise. Finally, Kassin testified that he had operated a bust-out in 1982 or 1983 which moved into a building housing one of Jemal's businesses -- a business which then ceased operations (apparently implying that Jemal decided to use the space for the bust-out scheme).

Richard Beda testified that in 1986 Jemal had purchased damaged clocks from him so that he could "stage" a flood and file an insurance claim (allegedly a regular practice of Jemal). Beda also testified that during a bust out operation he had operated in 1985, Jemal had advised him to make a lease agreement similar to that later entered into by Capital Merchandise.

Just before trial, Jemal voiced his opposition to the introduction of this prior bad acts evidence. His counsel stated:

7

This case should be distinguished from one in which we acknowledge that the defendant was either an employee or an officer of the corporation, that he was committing some acts which were otherwise innocent. Then the issue of the defendant's knowledge becomes important. The issue of his intent becomes important. In this case, our contention, quite simply, is that the defendant was not involved. The government alleges that my client was a signatory on the checking account and that he used the name "Mike Levy" as an alias. We deny that the defendant ever signed a check or had any power to sign any checks. We deny that my client used the name "Mike Levy."

Defense counsel continued that in order to preclude the introduction of the prior bad acts evidence:

I'm prepared to stipulate that if the government can establish that my client was the signatory on the checking account, and that if he participated in the other acts as described by Norman Levy, that they can find that the defendant had the requisite knowledge and intent as far as the mail fraud is concerned.

Nonetheless, the district court ruled that the prior bad acts testimony was admissible as showing modus operandi, intent, and lack of mistake. The court indicated that its probative value outweighed any undue prejudice and that it was too difficult to obtain a useful stipulation on intent in this case. Id.

Defense counsel then offered a new stipulation saying: [w]ith regard to the Count 1 of the indictment charging conspiracy, I would stipulate to all of the elements of the -- of that count of the indictment, save the defendant's membership in the conspiracy. With regards to Counts 2 through 7 alleging mail fraud, I would submit that the only

8

issue remaining is the issue of acting in
concert.  And even with regard to the issue
of acting in concert, I will stipulate that
if the government -- if the jury finds that
the testimony of Norman Levy is truthful,
then the jury may find that the defendant had
the requisite intent and may consider the
remaining elements of acting in concert.

After considering this stipulation, the court concluded that

"[e]ven with the proposal . . ., I think it's highly relevant

under the issue of knowledge of what bust-outs are, how they

operate.  I think it works also as evidential on the issue of

lack of mistake, so that even though intent may not be in play,

those others certainly are."

Finally, after the prosecution had presented fifteen

witnesses, defense counsel again raised the Rule 404(b) issue,

offering to stipulate that:
Levy testified that David Jemal committed the
following acts: 1.  Knowingly and
intentionally entering into a fictitious
lease arrangement.  2.  Participating in the
preparation and back-dating of corporate
documents.  3.  Supplying false financial
information to Dun & Bradstreet, and to
creditors.  4.  Ordering merchandise on
behalf of Capital Merchandise, Inc.  5.
Selling merchandise by Capital Merchandise,
Inc.  By his plea of not guilty David Jemal
denies having committed any of these acts. If
you find that the government has proven
beyond a reasonable doubt any one or more of
the acts alleged above, then I instruct you
that you must find that the defendant
possessed the requisite knowledge and intent.

Relying on its prior rationale, the district court again rejected

the offer to stipulate, but it did give limiting instructions to

the jury with respect to the use of the bad acts evidence.

9

B.   The Proper Rule

1) Background

Fed.R.Evid. 404(b) begins by stating that:
[e]vidence of other crimes, wrongs or acts is
not admissible to prove the character of a
person in order to show that he acted in
conformity therewith.

We have stated that:

[c]haracter evidence is not rejected because
it is irrelevant.  On the contrary, `it is
said to weigh too much with the jury and to
so overpersuade them as to prejudice one with
a bad general record and deny him a fair
opportunity to defend against a particular
charge.'  Michelson v. United States, 335
U.S. 469, 475-76, 69 S. Ct. 213, 218, 93
L.Ed. 168 (1948).

United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992)

Nonetheless, while prior bad acts evidence is

inadmissible to prove that the defendant "acted in conformity

therewith," "[character] evidence may . . . be admissible for

other purposes, such as proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or

accident."  Fed.R.Evid. 404(b).  We have recognized that Rule

404(b) is a rule of inclusion rather than of exclusion.  See

United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir.), cert.

denied, 488 U.S. 910, 109 S. Ct. 263 (1988).  Evidence can be

admitted even if it does not fit one of the specific exceptions

listed in the rule, so long as it is used for a purpose other

than proving a defendant's likelihood to have committed this

10

particular crime based on an inference drawn from evidence pertaining to his character.  Id. at 1019.

Despite our characterization of Rule 404(b) as a rule of admissibility, we have expressed our concern that, "[a]lthough the government will hardly admit it, the reasons proffered to admit prior bad act evidence may often be potemkin village, because the motive, we suspect, is often mixed between an urge to show some other consequential fact as well as to impugn the defendant's character."  See Sampson, 980 F.2d at 886. As a result, we held in Sampson that, "[i]f the government offers prior offense evidence, it must clearly articulate how that evidence fits into a chain of logical inferences, no link of which can be the inference that because the defendant commited . . . offenses before, he therefore is more likely to have commited this one."  Id. at 887.  Moreover, once the government articulates how the evidence fits into such a chain, the district court must weigh the probative value of the evidence against its potential to cause undue prejudice and articulate a rational explanation on the record for its decision to admit or exclude the evidence.  Id. at 889.[3]

---

[3]These steps follow the test for admissibility set out by the Supreme Court in Huddleston v. United States, 485 U.S. 681, 691, 108 S. Ct. 1496, 1502 (1988).  The Supreme Court stated that for prior bad acts evidence to be admitted: 1) it must have a proper purpose under Rule 404(b); 2) it must be relevant under Rule 402; 3) its probative value must outweigh its prejudicial effect under the standard of Rule 403; and 4) the court must charge the jury to consider the evidence only for the purpose for which it was admitted.  See id.

11

We review the Rule 404(b)/Rule 403 weighing process only for abuse of discretion; hence the district court has significant leeway in reaching its decision. Id. at 886. "If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." United States v. Long, 574 F.2d 761, 767 (3d Cir.), cert. denied, 439 U.S. 985, 99 S. Ct. 577 (1978).

### 2) Stipulations

The Second Circuit has held that, as a matter of law, it is an abuse of discretion for district courts to admit prior bad acts evidence to prove an issue such as knowledge or intent if the defendant takes sufficient steps to remove that issue from the case. See, e.g., United States v. Manafzadeh, 592 F.2d 81, 87 (2d Cir. 1979); United States v. Mohel, 604 F.2d 748, 753 (2d Cir. 1979), United States v. Figueroa, 618 F.2d 934, 941-42 (2d Cir. 1980). The initial question we are faced with in this case is whether we should follow the Second Circuit's rule.

Under the Second Circuit's rule, if the government offers Rule 404(b) evidence to prove knowledge or intent, the defendant can avoid introduction of the evidence if his defense is that "he did not do the charged act at all." United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988), cert. denied, 489 U.S. 1070 (1989). Thus, where a defendant has claimed that he did not distribute drugs at all rather than claiming that he distributed a substance that turned out to be drugs without knowledge that the substance was drugs, the Second Circuit has precluded the admission of prior crime evidence. See, e.g., Mohel, 604 F.2d at

12

755; Figueroa, 618 F.2d at 944; United States v. Colon, 880 F.2d 650, 662 (2d Cir. 1989). Many other courts of appeals essentially agree with the Second Circuit. See United States v. Jenkins, 7 F.3d 803, 807 (8th Cir. 1993) (observing that this interpretation comports with the clear language of the rule which makes bad acts evidence inadmissible to prove character); cf. United States v. Silva, 580 F.2d 144, 148 (5th Cir. 1978) (reasoning that where defendant's sole defense is denial of participation in the act, there is no issue of intent), United States v. Palmer, 990 F.2d 490, 495 (9th Cir. 1993), cert. denied, 114 S. Ct. 1120 (1994) (holding that where defendant's theory was that he had moved onto the property and had no part in growing the marijuana that was there, his statement that he had sold marijuana before was inadmissible).

In contrast, the Seventh Circuit has held that, "`[i]n cases involving specific intent crimes, intent is automatically an issue, regardless of whether the defendant has made intent an issue in the case.'" United States v. Mazzanti, 888 F.2d 1165, 1171 (7th Cir. 1989), (quoting United States v. Monzon, 869 F.2d 338, 344 (7th Cir.), cert. denied, 490 U.S. 1075, 109 S. Ct. 2087 (1989)). At a minimum, this means that in conducting the Rule 403 balancing test, district courts in the Seventh Circuit have been directed to consider prior bad acts evidence to be significantly probative regardless of the defense employed by the defendant. Mazzanti itself upheld a district court decision allowing the introduction of evidence of prior drug dealing where

13

the defendant conceded his presence at or near the scene but denied any wrongdoing.  See id.[4]

We have not yet taken a definitive position on the use of stipulations to remove Rule 404(b) evidence from a case, although we have expressed ourselves in the context of Rule 403 balancing generally.  In United States v. Provenzano, 620 F.2d 985 (3d Cir.), cert. denied, 449 U.S. 899, 101 S. Ct. 267 (1980), we considered the government's attempt to prove that a corporation was a sham corporation by introducing evidence that the defendant was in jail during the time period that he was supposedly running the corporation.  In considering the defendant's offer to stipulate that he was unavailable, we held that:

> [a]n offer to stipulate does not automatically mean that the fact may not be proved instead, as long as the probative value of the proof still exceeds the prejudicial effect, taking into account the offer to stipulate.  United States v. Grassi, 602 F.2d 1192, 1197 (5th Cir. 1979) ("A cold stipulation can deprive a party `of the legitimate moral force of his evidence,' 9 Wigmore on Evidence § 2591 at 589 (3d ed. 1940), and can never fully substitute for tangible, physical evidence or the testimony of witnesses.")

---

[4]The Fourth Circuit has taken an intermediate approach.  It has held that the use of prior bad acts evidence must be examined meticulously in each case and has strongly implied that the probative value of prior bad acts evidence is significantly less when the defense is that the defendant did not perform the charged act at all.  See United States v. Hernandez, 975 F.2d 1035, 1040 (4th Cir. 1992).  This is similar to the approach we will take in this case.  See infra at 17-19.

14

Id. at 1004.  We concluded in Provenzano that because the proposed stipulation would leave some doubt as to whether the defendant was completely unavailable and because of "the conceptual difficulty of structuring a stipulation that would convey the same fact of unavailability due to incarceration without adverting to that concept," id., admission of the evidence was not an abuse of discretion.

In United States v. Sheeran, 699 F.2d 112 (3d Cir. 1983), we summarized Provenzano as follows:

Although "[a]n offer to stipulate does not automatically mean that the fact may not be proved instead, as long as the probative value of the proof still exceeds the prejudicial effect taking into account the offer to stipulate," United States v. Provenzano, 620 F.2d 985, 1003-04 (3d Cir. 1980 (emphasis added), we have held that evidence admissible in the absence of such a concession sometimes should not be admitted where the defendant has offered "a suitable stipulation . . . that would convey the same fact," id. at 1004.

Sheeran, 699 F.2d at 118 n.12.  In Sheeran, in the absence of an offer to stipulate, we upheld the admission of evidence of prior bad acts by alleged co-conspirators to prove their control over companies involved in the charged conspiracy.

While we did not decide Provenzano and Sheeran under the specific rubric of Rule 404(b), we think that Provenzano, which involved the question of whether to admit evidence that the defendant was in jail, was in essence a Rule 404(b) case involving prior bad acts evidence.  Thus, at least in the absence of in banc reconsideration, Provenzano and Sheeran would seem to

15

prevent us from adopting the per se rule of the Second Circuit. That may be just as well inasmuch as there may be some cases, presently unforeseeable, which the district court might identify as properly calling for the admission of Rule 404(b) evidence notwithstanding a defendant's willingness to stipulate.

However, although we leave the door open, we believe that district courts should generally deem prior bad acts evidence inadmissible to prove an issue that the defendant makes clear he is not contesting. The relevance of the prior bad acts evidence will be minimal in most such cases, since the evidence will not bear on the issues being contested. And the undue prejudice will be quite high, since prior bad acts evidence tends to be quite persuasive. This is consistent with Provenzano's rule that stipulations should be taken into account in conducting a Rule 403 balancing analysis. See United States v. Hernandez, 975 F.2d 1035, 1040 (4th Cir. 1992) (employing a Rule 403 balancing analysis to reverse a district court's decision to admit evidence of defendants' prior sale of crack where the defense was that the defendant did not sell the crack involved at all and where there was no indication that the district court had carefully balanced the evidence).

We emphasize, however, that to succeed, the defendant's proffer must be comprehensive and unreserved, completely eliminating the government's need to prove the point it would otherwise try to establish using 404(b) evidence. As the Second Circuit explained, whether a defendant has removed an issue from the case:

16

> depends not on the form of words used by
> counsel but on the consequences that the
> trial court may properly attach to those
> words. When the Government offers prior act
> evidence to prove an issue, counsel must
> express a decision not to dispute that issue
> with sufficient clarity that the trial court
> will be justified (a) in sustaining objection
> to any subsequent cross-examination or jury
> argument that seeks to raise the issue and
> (b) in charging the jury that if they find
> all the other elements established beyond a
> reasonable doubt, they can resolve the issue
> against the defendant because it is not
> disputed.

Figueroa, 618 F.2d at 942.

When a defendant indicates a desire to preclude the admissibility of Rule 404(b) evidence by stipulating away a particular issue but the government offers a reasonable explanation as to why the proposed stipulation is inadequate, the district judge should explore the possibility of fashioning an agreement on a more comprehensive stipulation -- preferably in limine, as the recent Rule 404(b) amendment contemplates. See Fed. R. Evid 404(b) (amended in 1991). Finally, we note that even if the defendant is unwilling to make sufficient concessions to completely remove an issue from the case, the district court should weigh prejudice against probative value only after taking into account the defendant's "partial" stipulation, a weighing that we will review for abuse of discretion. Cf. Hernandez, 975 F.2d at 1040 (holding that the probative value of the use of prior bad acts evidence can be reduced by the defendant's willingness to concede certain issues).

17

### C. Application in this Case

We think that the district court acted properly in admitting prior bad acts evidence here to show that Jemal intended his actions to be part of a bust-out scheme and knew that his acts were part of such a scheme. Jemal did not offer a stipulation that completely removed the issues of intent and knowledge from the case despite an apparently sincere effort to do so, nor can we think of a stipulation that would have done the job. Cf. Garcia, 983 F.2d at 1174 ("[N]otwithstanding the sincerity of the defendant's offer, the concession must cover the necessary substantive ground to remove the issue from the case."). Although defense counsel asserted that "our contention, quite simply, is that the defendant was not involved," he had to concede that Jemal had participated in some of the acts alleged by the government to have been part of the bust-out scheme. With respect to those acts, defense counsel had to claim that while Jemal performed the acts, he did not do so with an intent to perpetrate a "bust out."

This becomes apparent from Jemal's final, and most complete, offer to stipulate to knowledge and intent -- an offer made after the district court stated its view that it was impossible to obtain a useful stipulation in this case. Jemal offered to stipulate that if the jury found that he had performed any of five acts described by Norman Levy, then it should find that he "possessed the requisite knowledge and intent." See supra at 10-11. But Jemal's position falters at the first act specified in the stipulation -- the backdating of the lease. The

18

government's position is that Jemal knowingly entered the backdated lease with the intention of having Capital Merchandise use the lease to boost its credit rating. This act was among the overt acts specified in the indictment as taken by the defendant in furtherance of the alleged conspiracy. Yet Jemal's proposed stipulation to knowledge and intent with respect to the lease would have required the government to prove knowledge and intent: Jemal proposed to stipulate that if the jury found that he "knowingly and intentionally entered into a fictitious lease arrangement," it should find that he possessed the requisite knowledge and intent.

Indeed, defense counsel admitted that his client had signed the lease but stated that he had not intended to use the lease as part of a bust-out. This brings the elements of knowledge and intent to the fore.[5] Cf. Provenzano, 620 F.2d at

---

[5]The government also claims that Jemal's proposed stipulation was inadequate because it did not list all of the acts which constituted Jemal's alleged crimes (assuming that he committed the acts with the requisite intent). For example, the government argues that Jemal sought to use Richard Beda's company as a phony credit reference, but Jemal's proposed stipulation did not cover this alleged act. The government, however, did not identify this supposed deficiency in the stipulation at trial; nor did the district court point to the absence of these acts in the stipulation as a basis for rejecting it. Given Jemal's sincere attempt to eliminate intent and knowledge from the case and his proposal of several alternative stipulations, we think that if the government or the district court felt that additional acts needed to be part of the stipulation to make it adequate, they should have pointed to these acts and allowed Jemal an opportunity to add them to the stipulation.

Moreover, the additional acts specified by the government would not have helped the government's case, for they were not sufficient to allow the jury to find Jemal guilty even if they were performed with the requisite intent. None of these acts was specified in the indictment as an overt act taken in

19

1004 (observing that a stipulation that the defendant was unavailable did not completely remove the issue as to whether the defendant might have been able to return in an emergency to help run the company in question); Garcia, 983 F.2d at 1174-75 (explaining that a concession that the defendant knew something about cocaine trafficking did not remove the issue of knowledge from the case where his defense was that he did not know of the presence of cocaine in his closet and did not apprehend the nature of drug paraphernalia that was visible in his apartment); Colon, 880 F.2d at 658 (observing that a stipulation to intent if the government proved that the defendant intended to direct an undercover officer to a particular person to buy drugs did not remove the issue of intent from the case).

Moreover, as the second part of the proposed stipulation, Jemal agreed that if the government proved that he had participated in the backdating of corporate documents, the jury could then infer knowledge and intent. Unlike the first act specified in the stipulation, proof of this act does not on the surface require proof of knowledge and intent. But Jemal's actual argument with respect to this backdating was that, while

furtherance of the conspiracy (in fact, none was an act taken with Jemal's alleged co-conspirator) and none was an act which involved mail fraud. Thus, in order to obtain a conviction on either the conspiracy or the substantive counts, the government had to prove that Jemal performed at least one of the acts listed in his proposed stipulation -- and Jemal conceded that if the government proved that he performed any of these acts, then the jury should find the requisite knowledge and intent. We therefore do not rely on Jemal's failure to list additional acts in his proposed stipulation as a basis for upholding the district court's Rule 404(b) determination.

20

he did backdate the documents, he did so without the intent to use the documents for a bust-out. Defense counsel argued, "you see, if [the intent to defraud] occurred during a meeting at Sam Kassin's office[,] . . . if that's when Mr. Jemal allegedly made his mind up to bust this corporation out, then the backdating of the documents . . . doesn't have a sinister intent."[6] Thus, Jemal had no real way of completely excising the issues of knowledge and intent from this case.

Hypothetically, Jemal could have removed these issues by contending that he did not participate in any of the acts alleged by the government -- including formation of the fictitious lease and backdating of the corporate documents -- and then he could have conceded that, if the government proved that he engaged in any of these acts, the jury should find knowledge and intent. But Jemal did not offer to make such a concession and could not have done so as part of a reasonable defense strategy, because the evidence that Jemal engaged in these acts was too strong for him realistically to contest it.

Jemal's proposed stipulation did reduce the role that knowledge and intent played in the case, since, with respect to the acts other than signing the fictitious lease and backdating

_____

[6]Defense counsel made this statement after the district court had refused to accept the proposed stipulation. It may be that if the district court had accepted his proposed stipulation, counsel would simply have argued that defendant did not participate in the backdating of the corporate documents and he would not have argued intent. However, the evidence of defendant's participation in the backdating of the documents was overwhelming, thus, the fact that the district court's refusal to accept the stipulation foreclosed the possibility of relying on this strategy can be deemed harmless error.

the documents, Jemal was willing to concede knowledge and intent if the government proved he engaged in the acts.  The question becomes whether, given this concession, the district court abused its discretion in finding that the probative value of the evidence outweighed its undue prejudice.  Jemal makes no real effort to argue that it did -- he expends almost all of his capital in the contention we have now rejected, namely, that he had completely removed the issues of knowledge and intent from the case.

We hold that the district court did not abuse its discretion.  The testimony that Jemal had participated in prior bust-outs (in at least one case by acting as a landlord), and that he had advised Beda that in order to successfully engage in a bust-out he should formulate a lease agreement similar to that later used by Capital Merchandise, was highly relevant to the issue of whether Jemal knowingly and intentionally entered a fictitious lease agreement for the purpose of engaging in a bust-out.  The district court was well within its discretion in holding that the probative value of this evidence was not substantially outweighed by any unfairly prejudicial effect.

The judgment of the district court will be affirmed.