**UNITED STATES of America**

v.

**Andrew SAMUELS, Appellant in No. 83–1820,**

v.

**John NEWELL, Appellant in No. 83–1822.**

Nos. 83–1820, 83–1822.

United States Court of Appeals, Third Circuit.

Argued June 12, 1984.

Decided July 27, 1984.

Rehearing and Rehearing In Banc Denied Aug. 23, 1984.

Richard D. Atkins (argued), Philadelphia, Pa., for Andrew Samuels.

Theodore Simon (argued), Philadelphia, Pa., for John Newell.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Elizabeth K. Ainslie (argued), Anne Whatley Chain, Asst. U.S. Attys., Philadelphia, Pa., for appellee.

Before SEITZ, ADAMS, Circuit Judges, and LATCHUM, District Judge *.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Andrew Samuels and John Newell were charged, along with twelve other defendants, in a multi-count indictment that described the operations of a drug-related conspiracy. Samuels was specifically mentioned in three counts, and Newell in two.

The first count of the indictment charges that Samuels and Newell conspired with several people, some known, others not, to distribute heroin in violation of 21 U.S.C. § 841(a)(1) (1982). The indictment also alleges that Newell used a telephone to facilitate the heroin conspiracy, in violation of 21 U.S.C. § 843(b), by obtaining the telephone number of one of his drug customers. Finally, Samuels is charged in two counts with using a telephone on certain dates to facilitate the conspiracy by discussing possible exchanges of heroin for cocaine, in violation of 21 U.S.C. § 843(b) (1982).

After a bench trial, Samuels and Newell were convicted of the various crimes for which they had been indicted. The evidence presented by both sides consisted principally of recordings of a number of telephone conversations as well as a series of stipulations. The government's only witness was Lawrence Kutney, an undercover narcotics agent with the Pennsylvania Department of Justice. Kutney interpreted the telephone conversations that were introduced into evidence and provided expert testimony as to the nature of illicit drug traffic.

At trial, Samuels and Newell admitted that they were friends of the principal conspirator, Anthony DeAngelis, and that they were occasional drug users. They argued, however, that use is not a federal crime and, in any event, that the purchase of drugs is not enough to tie them to a conspiracy to distribute heroin as set forth in the indictment.[1]

Although we are mindful of the deference that should be shown to the determinations by the district court, we are also aware of our obligation to review those determinations on the basis of the evidence presented at trial. Having examined that evidence and the reasonable inferences that can be drawn from it in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we have serious doubts that the government has proven, beyond a reasonable doubt, that Samuels and Newell were implicated in the crimes for which they were convicted. We will, therefore, reverse the conviction of Newell on all counts and reverse the conviction of Samuels on the facilitation

---

* Hon. James L. Latchum, United States District Court for the District of Delaware, sitting by designation.

1. *See United States v. Webster*, 639 F.2d 174, 188–89 (4th Cir.1981); *United States v. Martin*, 599 F.2d 880, 889 (9th Cir.1979); *United States v. Bailey*, 607 F.2d 237, 245 (9th Cir.1979); *United States v. Watson*, 594 F.2d 1330, 1337 (10th Cir.1979); *United States v. Swiderski*, 548 F.2d 445, 450 (2d Cir.1977); *United States v. Varelli*, 407 F.2d 735, 748 (7th Cir.1969).

counts. We will, however, affirm Samuels' conviction and sentence for conspiring to distribute heroin.

## I

The determination of guilt rests initially with the trier-of-fact, who ordinarily hears the evidence "live" and can make those judgments of credibility implicit in the final decision on the basis of first-hand observation of the witness' demeanor and manner. That does not mean, however, that a district court's verdict must be affirmed in all circumstances, especially, as in this case, when our natural reluctance to question the sometimes subtle judgments a trial judge must make is tempered by the fact that the record consists almost exclusively of transcribed conversations. Although we do not lightly overturn a judge's finding, we do so here in fulfilling our responsibility to "guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976).

## A

Count 38 charges that on October 20, 1981, Newell used a telephone to facilitate a conspiracy to distribute heroin by obtaining the telephone number of a drug customer, identified by the government at trial and in its brief on appeal as Mr. John Carlo. The evidence introduced at trial to support this charge consisted of a tape-recorded telephone conversation intercepted by a court-authorized wiretap on a phone frequently used by DeAngelis, the "hub" of the conspiracy.[2]

The transcript of the recorded conversations shows that on October 20, Newell used DeAngelis' phone to call his own home.[3] App. 95–96. An unidentified male, whom Newell calls "Jim," answers the phone and tells Newell that someone has been looking for him. In the government's version of the transcript, that someone ·is called "John Carlo;" in Newell's version, "Giancarlo." When Newell asks Jim to look up a number where John Carlo or Giancarlo can be reached, Newell—in the government's eyes—has committed a crime: he has used a telephone to facilitate a drug conspiracy by obtaining the number of his drug customer, John Carlo. Other than the transcript of this phone conversation, the government produced no evidence to support this charge.

At trial, it was explained without contradiction that Newell lived with someone called "Giancarlo Fontenot." Newell presented voter registration records to show that such a person resides at the same address as Newell. App. 197–98, 213–14. He also presented telephone company records showing that the first number he called is listed at the residence of Giancarlo Fontenot and that the number Jim gave Newell was subscribed to by Giovanni Fontenot, Giancarlo's father. App. 197, 213. The transcripts show that Newell called that number moments after he spoke with Jim. App. 95, 215. Newell asserted that the woman who answered his call is Giancarlo's mother. In any event, when Newell identifies himself and asks for Giancarlo, the woman explains that Giancarlo has just left. She corrects Newell's use of the phrase "Buon Giorno" (sic), and he explains that "he'll try to find him [Giancarlo] at home." Half an hour later Newell makes ·a second call to his own home. When queried, Jim explains that "he" has not called back. App. 216. Newell replies: "Okay when he calls, tell him I'll be home by 11:00 or 11:30." The entire conversation consists of nine sentences or fragments of sentences.

---

**2.** DeAngelis has pled guilty to the charges set forth against him in the indictment. At trial, Samuels and Newell offered affidavits in which DeAngelis affirmed that neither appellant was aware of DeAngelis' activities as a member of a conspiracy or had agreed to distribute heroin, although each had obtained from him "very small amounts [of heroin] on a few occasions." App. 217, 222.

**3.** That transcript, as well as transcripts of the conversation Newell introduced in his own defense, is reproduced as an Appendix to this opinion.

■ No other evidence supports or even bears upon the charge that Newell used a communication device to obtain the telephone number of a drug customer, John Carlo. The government has not borne its burden of proving beyond a reasonable doubt that Newell is guilty of this crime. No evidence has been adduced to show that Fontenot is engaged in drug-trafficking. The government may not simply refer, as it did at oral argument, to the conversation in which Newell tried to obtain the number of his drug customer, "Mr. Carlo," as evidence to support this conviction.

### B

Newell was also found guilty of acting in furtherance of a conspiracy to distribute heroin. To support this conviction, the prosecution cites *United States v. Provenzano*, 620 F.2d 985 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980), for the proposition that "[o]nce the government has proven the existence of a conspiracy, slight evidence is sufficient to connect a defendant with it." Government's Brief at 11. We find no support in *Provenzano* for that position or for the notion that in a conspiracy trial the government is relieved of the traditional burden of proving every element of the offense beyond a reasonable doubt.[4] *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *United States v. Cooper*, 567 F.2d 252 (3d Cir.1977).

To support Newell's conviction for conspiracy to distribute heroin, the prosecution points to two items of evidence. The first is Newell's use of the telephone to obtain the number of his alleged drug customer, "John Carlo." That conversation proves as little with regard to the conspiracy charge as it does with regard to the facilitation charge. The second piece of evidence, however, is more equivocal.

■ On October 12, Newell reports in a phone conversation with DeAngelis that "since this last one, I got lots of, ah, flak." App. 41. The context of Newell's remark does not reveal what the "last one" is, but DeAngelis replies: "Yeah, well, it shouldn't be this time." At trial, in its brief, and at oral argument, the prosecution contended that Newell and DeAngelis were referring to an earlier cocaine transaction.[5] If this is so, the conversation of October 12th cannot be taken as evidence of Newell's conspiring to distribute heroin. There is no doubt that the conversation may point to some other crime, but it is not proof of the crime alleged. As Chief Justice Marshall remarked in a different context, "[t]he rule that a man shall not be charged with one crime, and convicted of another, may sometimes cover real guilt, but its observance is essential to the preservation of innocence."[6] *The Schooner Hoppet v. United States*, 11 U.S. (7 Cranch) 244, 247, 3 L.Ed. 380 (1813).

### C

Samuels has also been convicted of using a telephone to facilitate a conspiracy to distribute heroin. Counts 29 and 39 allege that Samuels spoke to DeAngelis on two specific occasions to discuss "a possible exchange of heroin for cocaine." At trial, the government offered the transcript of two telephone conversations to support

---

**4.** *Provenzano* does refer to the "slight evidence" rule apparently adopted in the Ninth Circuit to govern the admissibility of a co-conspirator's hearsay declarations. 620 F.2d at 999. In the Third Circuit, the admission of such evidence requires "a fair preponderance of independent evidence," but neither rule lessens the government's ultimate burden of proving the defendant's guilt beyond a reasonable doubt. *See United States v. Gibbs*, 739 F.2d 838 (3d Cir.1984).

**5.** Kutney also testified that he believed Newell was referring to complaints about cocaine. Supp.App. 16–17; Government's Brief at 6.

**6.** That same thought is embodied in the ban on constructive amendments of grand jury indictments and in the rule that a conviction must be reversed if the proof advanced at trial varies significantly from the charges and substantial rights of the accused are affected. *Stirone v. United States*, 361 U.S. 212, 215, 217, 80 S.Ct. 270, 272, 273, 4 L.Ed.2d 252 (1960); *United States v. Cusmano*, 659 F.2d 714, 719 (6th Cir. 1981); *United States v. Crocker*, 568 F.2d 1049 (3d Cir.1977).

these charges. In the first, Samuels learns that DeAngelis has acquired some heroin and arranges a visit. DeAngelis asks Samuels to bring along a pack of cigarettes and "three rolls" of something he describes by using, according to Agent Kutney (App. 169), street slang for marijuana.[7]

The prosecution asserts that this conversation proves beyond a reasonable doubt that Samuels used a telephone to facilitate a conspiracy to distribute heroin by discussing a possible exchange of heroin for cocaine. At trial, Samuels maintained that this was but one of several instances in which he exchanged small amounts of marijuana for small amounts of heroin that he and DeAngelis would sometimes consume together.[8]

As evidence for the second facilitation charge, the government proffered the transcript of one conversation. On October 14, DeAngelis called Samuels and explained that he has gotten what Samuels had asked about earlier—his "male friend." App. 64. It was uncontradicted at trial that the term, "male friend," referred to heroin. DeAngelis responded by suggesting that "[I]'ll trade ya." [9] App. 64. Agent Kutney testified that the trade DeAngelis envisioned was heroin for some marijuana. App. 168–69.

■■■ It is difficult to see how these conversations and the testimony describing them can support beyond a reasonable doubt two felony convictions for the crimes alleged in the indictment. The prosecution argues that "Samuels' admission that he traded marijuana for heroin ... is basically

dispositive of the issues raised with respect to the two telephone counts." Government's Brief at 19. We cannot agree that such an admission would support an indictment charging that on certain dates Samuels "did knowingly and intentionally use a ... telephone in facilitating a ... conspiracy to distribute heroin ... [by] discuss[ing] a possible exchange of heroin for cocaine." App. 7, 9 (Counts 29 and 39). *See supra* note 6. An accused cannot be convicted of a crime alleged in an indictment by virtue of proof that he committed some other offense. *United States v. Martin,* 599 F.2d 880, 888 (9th Cir.1979); *United States v. White,* 569 F.2d 263, 268 (5th Cir.1978) (the "substance involved in the transaction must be the same illegal substance alleged in the indictment").

The concern that prompts us to reverse Samuels' convictions for facilitation is grounded not only in the insubstantiality of the evidence the government adduces to support the charges specified in the indictment, but also in the difference between the conversations DeAngelis has with Samuels and those he has with other indicted co-conspirators. The latter clearly reveal actual drug transactions between persons who are intent on doing illicit drug business.[10] DeAngelis does not have to prompt these people so that they realize what he is talking about in code, and what he is talking about is always clear, at least given Agent Kutney's expert testimony.

There is some tendency in conspiracy cases for finders-of-fact to believe that a defendant must have been involved in the

---

7. The next day Samuels calls to find out whether DeAngelis liked whatever it was that he left the day before. App. 100–101. DeAngelis explains that he had left it out to air, that it "smells a little bit now." App. 100. Kutney testified that cocaine, an odorless drug, would become worthless if left out to air. App. 171.

8. Kutney testified that when he first heard the tape, he thought that Samuels and DeAngelis were referring to cocaine, although he suspected that they were actually talking about marijuana. App. 170–172. DeAngelis told Samuels that what he left weighed less than an ounce. App. 100. Kutney testified that an ounce of marijua-

na would have a value between $20 and $50. App. 185.

9. The conversation does not reveal what DeAngelis is interested in trading for, but Samuels seems to know. "Oh you mean for my ...," he asked, "pretty good, isn't it." App. 64–65. The day before, Samuels had brought DeAngelis, at his request, "some good smoke," that is, some marijuana. Samuels was going to "twist up a few" (roll some marijuana cigarettes according to Kutney, App. 165–66) before visiting DeAngelis. App. 52.

10. *See* App. 26–27, 61–62, 138–39.

conspiracy, once evidence has been presented of some questionable acts the prosecution contends are but an extension of the larger conspiracy. Under our system of law, however, guilt must remain personal and individual, and a conviction, especially on charges relating to a conspiracy, must rest on individual guilt proven beyond a reasonable doubt. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 9 L.Ed. 1557 (1946). We cannot find such proof for any of the charges discussed so far.

## II

The evidence the prosecution has brought forward to implicate Samuels in the conspiracy is more persuasive. On October 12, alleged co-conspirator Friedman tells DeAngelis that if DeAngelis needs cash, Friedman will have Samuels give DeAngelis the money Samuels owes Friedman.[11] App. 36–37. The next day Samuels calls DeAngelis and explains that he was "supposed to drop something off." App. 52. The government alleges that this something was the money Samuels had agreed to pass on to DeAngelis and that Samuels knew that the cash would be used to fund a drug deal.[12]

█ Viewing this conversation in the light most favorable to the government, as we are required to do on a motion after a guilty verdict, a trier-of-fact could reasonably conclude that on this occasion Samuels knowingly acted in furtherance of the conspiracy. Samuels knew that DeAngelis sold controlled substances, and he was sufficiently acquainted with Friedman to have owed him a substantial sum of money. Consequently, we believe that sufficient evidence had been presented at trial to link

Friedman with the conspiracy and to support the inference that Samuels knew of this link.

## III

For the reasons set forth above, the judgments of conviction against Newell will be reversed, along with the judgments of conviction against Samuels on the charges of using a telephone on certain dates to facilitate a conspiracy to distribute heroin. Samuels' conviction on the conspiracy charge will be affirmed.

## APPENDIX

At trial the government produced the following transcription to prove that Newell had used a telephone to obtain the number of a drug customer.

DLE–81–047

Tape T14, Log # 36

DATE: 20 October 1981

TIME: 2140–2142

OUTGOING CALL: TO 386–4922[13]

JIM LNU: Hello.

John NEWELL: Jim?

JIM: Yeah.

NEWELL: Yeah.

JIM: Hi. Where are you?

NEWELL: I'm, ah, up in the country, why?

JIM: Oh, John Carlo's been calling for you and I didn't

NEWELL: Where is he?

JIM: He didn't he didn't say but like, you know, the last time he called he kinda figured you went to New York and I said well I don't know, you were thinking about it.

---

11. Although Friedman was named in the indictment, it appears that he has not been brought to trial or at least that he was a fugitive at the time of Samuels and Newell's trial. Appellant's brief at 4.

12. The prosecution also points to another portion of that conversation as evidence of Samuels' participation in the conspiracy. Just before they end their talk, Samuels asks DeAngelis whether "anything['s] going on." App. 53. "Tomorrow maybe" is the reply, to which Samuels

responds: "OK, I just wanted to know 'cause I would've called somebody, gotten some bread, so its no sweat." *Id.* The prosecution argues that these remarks prove that Samuels had drug customers of his own who would have advanced the money to enable Samuels to purchase heroin from DeAngelis.

13. This is the number at Newell's residence. App. 197–98.

NEWELL: What, ah, could you do me a favor and look into my telephone book? On the front page you'll find John Carlo's phone number.

JIM: Alright, hold on a second.

NEWELL: Mm hmm.

JIM: Do you know where your telephone book is?

NEWELL: What?

JIM: Do you know where your telephone book is?

NEWELL: Isn't it right on the bed? It's red. It's right in the bedroom somewhere.

JIM: Alright, hold on.

NEWELL: Check the, uh

JIM: Now wait, I found it. In the front of it?

NEWELL: First page, it's a little yellow piece down at the bottom. Not under A, it's the very first

JIM: Oh, there it is, 878

NEWELL: 878

JIM: Uh huh, 4518

NEWELL: OK.

JIM: OK?

NEWELL: I'll try that, I'll give you a quick ring back.

JIM: Bye.

NEWELL: Bye.

JIM: Bye.

End of Conversation

App. 95–96.

The defense offered transcriptions of two conversations.

TAPE T13, L36A
DATE: 20 OCTOBER 1981
TIME: 21:42
OUTGOING CALL: TO 878–4518 [14]

Giancarlo's Mother: Hello.

John Newell: Buon Giorno, is Giancarlo there?

G's M: No he's not.

JN: Oh, this is John.

G's M: Yes.

JN: When did he leave?

G's M: Ah... half an hour ago.

JN: Awhile ago?

G's M: Yes...

JN: Okay, I'll try to reach...

G's M: You don't say Buon Giorno, you say Buon Serra

JN: I said Buon Giorno.

G's M: Buon Giorno you say in the morning.

JN: Oh

G's M & JN laugh together for a few seconds

G's M: Buona Serra.

JN: Buona Serra, I would say it wrong ... right?

G's M: That's all right.

JN: Okay, I'll try and find him at home.

G's M: Yes.

JN: See you soon.

G's M: Buona Nota

JN: Buona Nota.

G's M: Bye.

JN: Bye.

End of Conversation

App. 215.

TAPE T13, LOG # 36B
DATE: 20 OCTOBER 1981
TIME: 22:14
OUTGOING CALL TO 386–4922

JOHN NEWELL: Hello ... yeah big story ... Jim

JIM: Bill? John? Hi!

JN: Did he call back?

JIM: Nope.

JN: Okay, when he calls tell him I'll be home by 11:00 or 11:30.

JIM: Okay

JN: Okay

JIM: Bye

JN: Bye-bye.

End of Conversation.

App. 216

---

**14.** This number is subscribed to by Giovanni   Fontenot. App. 197, 213.