**UNITED STATES**

v.

**Adrian MASTRANGELO, Jr.**

**Criminal Action No. 94–522–05.**

United States District Court,
E.D. Pennsylvania.

Aug. 28, 1996.

Ewald Zittlau, Assistant U.S. Attorney, Philadelphia, PA, for Plaintiff.

Stephen P. Patrizio, Defense Counsel, Philadelphia, PA, for Defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

The defendant, Adrian Mastrangelo, Jr., was charged with two counts of a twelve count indictment alleging a plan to manufacture and distribute methamphetamine.[1] After a jury trial, in which he was convicted of one of the two counts (conspiracy to manufacture methamphetamine) and acquitted of the other (attempt to manufacture methamphetamine), the defendant filed a post-trial motion for acquittal pursuant to Federal Rule of Criminal Procedure 29(c) or, in the alternative, for a new trial pursuant to Rule 33.

### MOTION FOR ACQUITTAL

The motion for acquittal comprises two parts. In the first part, the defendant argues that insufficient evidence was presented at trial to sustain his conviction. In the second, he argues that the indictment should have been dismissed because outrageous behavior on the part of the government deprived him of his due process rights. These arguments will be considered in turn.

### 1. Sufficiency of the Evidence

■ The United States Court of Appeals for the Third Circuit has set out the standard it applies in considering a post-conviction challenge based on the sufficiency of the evidence as follows:

> [A]n appellate court must sustain the verdict of a jury if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision. In determining whether evidence is sufficient, we will not weigh evidence or determine the credibility of witnesses.... [R]eversal on the grounds of insufficient evidence should be confined to cases where the failure of the prosecution is clear. The evidence need not be inconsistent with every conclusion save that of guilt, so long as it establishes a case from which a jury could find the defendant guilty beyond a reasonable doubt. A defendant challenging the sufficiency of the evidence bears a heavy burden.

*U.S. v. Carr,* 25 F.3d 1194, 1201 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 341, 130 L.Ed.2d 298 (1994) (quoting *U.S. v. Casper,* 956 F.2d 416, 421 (3d Cir.1992). The court further states that "the government can rely entirely on circumstantial evidence to prove that an alleged conspirator had the knowledge and intent necessary to commit the crime." *Id.* While the elements of a conspiracy may be proved entirely by circumstantial evidence, each element must be proved beyond a reasonable doubt, and although the defendant's participation in the conspiracy may be slight, it too must be proved beyond a reasonable doubt. *U.S. v. McGlory,* 968 F.2d 309, 321 (3d Cir.1992) *cert. denied,* 506 U.S. 956, 113 S.Ct. 415, 121 L.Ed.2d 339 (1993); *U.S. v. Wexler,* 838 F.2d 88, 90 (3d Cir.1988).

■ The defendant does not challenge the government's proof of the existence of the conspiracy in which he was charged with participating; his claim is that there is no competent evidence linking him to it. The defendant cites several Third Circuit cases in which the court of appeals reversed the de-

---

1. Besides the defendant, four others were charged as co-conspirators. Three of them pleaded guilty and charges against the fourth were dropped.

fendant's conviction for conspiracy because he had not been proved to have the same "unity of purpose", the same intent and agreement to work together to achieve a common goal, as other members of the conspiracy. *See, e.g., Wexler,* 838 F.2d at 90; *U.S. v. Samuels,* 741 F.2d 570 (3d Cir.1984); *U.S. v. Cooper,* 567 F.2d 252 (3d Cir.1977). The defendant contends there is the same lack of proof in his case.

At trial, the government presented evidence by audio tapes, testimony, and exhibits that Michael DeJulius, Raymond D'Aulerio, Adrian Mastrangelo, III (the defendant's son), and unidentified others conspired to manufacture and distribute methamphetamine from on or about July 30, 1993 to on or about October 4, 1993. Detectives from the Philadelphia Police Department had joined with Special Agents of United States Drug Enforcement Administration ("DEA") to discover the source of the methamphetamine that co-conspirators DeJulius and D'Aulerio had distributed earlier in the year.

Paul Rosa, a cooperating witness, ordered three pounds of methamphetamine from DeJulius and D'Aulerio in June of 1993, but he was told that DeJulius could not provide it because the suppliers lacked a crucial ingredient, methylamine. The government then decided to try a "reverse sting" operation, providing DeJulius with methylamine through Paul Rosa and tracing its route back to DeJulius's supplier and, ultimately, to the manufacturer.

The government assembled a massive surveillance force to track the path of the methylamine on foot, by vehicle, and by helicopter. At about noon on August 5, 1993, at 8th and Washington Streets in Philadelphia, Rosa gave DeJulius a white box, with "J.T. Baker" on the side, containing four bottles of methylamine.[2] At about 4:35 p.m., DeJulius delivered the box to a second person, who delivered it to Adrian Mastrangelo, III, who took the box to a garage ("Garage G"), located in the 800 block of Latona Street. Adrian Mastrangelo, III returned some hours later, at 8:45 p.m., retrieved what appeared to be the box, then partially covered by a plastic

bag, and took it to his house at 2034 Wolf Street. All these locations were within a short distance of each other. The government kept a 24 hour surveillance on Garage G and the Wolf St. residence; however, street conditions made it difficult for the agents to observe everything that went in and out of the locations.

On August 7, 1993, the defendant, Adrian Mastrangelo, Jr., arrived at the Wolf Street house of his son, Adrian, III, driving a Jeep. Five minutes later, father and son left the house. This time the son drove the Jeep and the defendant drove a white van. They went to 1413 S. 12th St., where items were moved in and out of the white van. The two men then switched vehicles and drove to Garage G. There, a detective in a surveillance van across from the garage saw the son get out of the white van, look at the surveillance van, look at the Jeep, and make a movement with his shoulders. Then, someone tried to open the door of the surveillance van, which was locked. The detective testified that the son was the person closest to the van. Again, things were moved into, and possibly out of, the white van.

Father and son then left the area and drove north on I–95 in both vehicles, the son driving the van. They took turns in the lead, drove at or below the speed limit, and at one exit, both vehicles got off the highway and immediately re-entered it. There was testimony that both the exit and re-entry and the use of two vehicles that alternated taking the lead when only one vehicle was needed might have been counter-surveillance measures, to see if anyone was following. After leaving the highway, father and son drove to a storage facility in Bristol, Pennsylvania, called Four–Storage. The defendant parked his Jeep at a nearby apartment complex and the two men took the van into Four–Storage, opening the gate by using a code that the government later determined was assigned to storage locker H–16. They stayed inside about five minutes, came out, and drove both vehicles back to the son's Wolf Street resi-

---

2. "J.T. Baker" was the name of a company that was a supplier of methylamine. The bottles in

the box were marked so that the government could identify them later.

dence.[3]

The government presented evidence that the storage locker to which the Mastrangelos had the code, H–16, had been rented in the name of Raymond Burgos, Jr., or Raymond Burgo, 1416 Neshaminy Valley Drive, Bensalem, Pennsylvania, which is located a short distance from Four–Storage. No Raymond Burgos lived there, but the defendant lived in the same apartment complex, at 1457 Neshaminy Valley Drive. A contact telephone number listed on the rental lease for the locker was a number that the defendant had used as a contact number in the past. That number was listed to an address, 924 Hoffman St., Philadelphia, where the defendant had lived in the past, and at the time of the sting, two automobiles were registered to him at that address. A forensic handwriting expert testified that the signature and initials on the lease agreement were probably written by the defendant, and the rental agent described the renter as a man of approximately the same height, age and hair color as the defendant.

On August 25, 1993, government agents undertook a covert search of locker H–16. There, they found the J.T. Baker box containing one of the marked methylamine bottles given to Paul Rosa for distribution. It was empty except for a slight residue of methylamine. In addition, the locker contained ingredients and equipment necessary for the manufacture of DL-methamphetamine: aluminum foil, muriatic acid, lye, grain alcohol bottles (empty), thermometers, funnels, laboratory flasks, condensers. It also contained jars that had a residue of methamphetamine. The agents photographed the items and left them in the locker as they had found them, returning on September 17 to seize everything in the locker except for some domestic items: a humidifier, a baby stroller, and a few rolls of Christmas paper. The fingerprint of Adrian Mastrangelo, III was found on the methylamine bottle in the J.T. Baker box, and that of the defendant was found on a separatory funnel.

Government witnesses testified that locker H–16 contained everything needed for a clandestine methamphetamine laboratory except P2P, the most expensive ingredient, and the methylamine, which had apparently been used. One witness, Jack Fasanello, a senior forensic chemist with the DEA testified about the methods and equipment used in the clandestine manufacture of methamphetamine. Another, Will Kane, a Philadelphia Police Officer assigned to the DEA Task Force in Philadelphia, stated that manufacturers of methamphetamine liked to keep ingredients separated, especially the P2P, which was the most important and most expensive ingredient. He gave his opinion that the person who controlled storage locker H–16 was either the financier or the "cook" for the methamphetamine manufacturing operation. Finally, the parties stipulated that the defendant had the chemical background to know the ingredients and equipment necessary to make methamphetamine.

On October 4, 1993, search warrants were executed at a number of locations, including Garage G and the residences of Michael DeJulius, Raymond D'Aulerio, and Adrian Mastrangelo, III. Garage G was found to contain documents in the names of both father and son and a 1983 catalogue for chemical supplies and equipment. Three days later, on October 7, the defendant returned to Four–Storage and was recorded by a video camera the government had installed on September 9, 1993, at a location across from locker H–16. The jury saw the videotape, which showed the defendant driving up to locker H–16 and getting out of his vehicle. After looking around him, he unlocked the two padlocks on the door and opened the storage locker. He looked into the locker, which was empty except for the domestic items, immediately removed the padlocks and left. Neither he nor anyone else reported to the storage facility that items had been removed from the locker, nor did anyone return for the domestic items. Four–Storage called the contact numbers to let the renter know the locker was unsecured and to see if

---

**3.** After the defendant left Four–Storage, government agents maintained surveillance outside it; however, they missed someone who they later learned entered the facility the following day, August 8, used the code for locker H–16, and stayed there about ten minutes. The person evidently used a vehicle with which the government was not familiar.

he meant to vacate it, but the first number had been disconnected and at the second number, the person who returned the call said he knew nothing about a storage locker and had no idea why his number was on the lease.

The same day he found the storage locker empty, the defendant transferred the title of his Jeep to his girlfriend, Phyllis Vizzachero. Five days later, on October 12, 1993, he re-registered a truck he had bought ten months earlier to Frances Nuciforo of Blackwood, New Jersey, although in April of 1995, he was using the truck. The day after the defendant re-registered his truck, the telephone at 1457 Neshaminy Valley Drive, where the defendant had been living, was disconnected. A year later, on December 14, 1994, the defendant and four others, including his son, were indicted. The other four were arrested within a week, but the defendant eluded authorities. In April of 1995, Phyllis Vizzachero arranged for the defendant to meet with an attorney, who discussed the indictment with him and recommended his surrender. The defendant did not surrender, and his whereabouts remained unknown to authorities until May 20, 1995, when a United States Marshal followed Ms. Vizzachero to her sister's residence, found the defendant there, and arrested him.

The jury found the defendant guilty of Count 2, conspiracy to manufacture methamphetamine. To do so, it had to find the prosecution had proved, beyond a reasonable doubt, (1) that the conspiracy was willfully formed and was existing on or about the time alleged (which the defense concedes) and (2) that the defendant willfully was a member of the conspiracy. *U.S. v. Price*, 13 F.3d 711, 724 (3d Cir.1994). The jury found the defendant not guilty of Count 12, attempt to manufacture methamphetamine. My task is to determine whether the evidence was sufficient to support the jury's finding that, beyond a reasonable doubt, the defendant was a member of the conspiracy to manufacture methamphetamine. The defendant argues that his participation was not proved beyond a reasonable doubt. He contends that he was never mentioned in the tapes or conversations about the conspiracy, that there is no

real evidence implicating him, and that the government is relying on "guilt by association" with his son. Bearing in mind the Third Circuit's standard that the jury's verdict must be allowed to stand if there is "substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision," that the evidence need not be inconsistent with every conclusion save that of guilt, and that the evidence may be entirely circumstantial, I will review the government's evidence in support of the verdict.

As the defendant has noted, knowledge of a conspiracy will not make someone a member of it, even if he associates with its members. *U.S. v. Coleman*, 811 F.2d 804, 808 (3d Cir.1987); *Wexler*, 838 F.2d at 91. Nor will his facilitating the conspiracy make him a member of it, if he did not know its specific goals. *Cooper*, 567 F.2d at 254–55. In order to be a member of a conspiracy, a defendant must both know its goals and take steps to facilitate the conspiracy during its lifetime. *U.S. v. Soto*, 716 F.2d 989, 991 (3d Cir.1983). In this case, the government provided circumstantial evidence that the defendant knew the goals of the conspiracy and that he facilitated its goals in one or more ways.

The jury was presented with substantial evidence from which it could infer that the defendant knew that materials for the manufacture of methamphetamine in this conspiracy were stored in locker H–16. The locker had everything needed for a clandestine manufacture of methamphetamine except P2P and methylamine. It contained one of the government's methylamine bottles, empty except for a slight residue, in the J.H. Baker box. The defendant stipulated he was familiar with the ingredients and equipment necessary for making methamphetamine. From that, the jury could find that, if he had seen the items in the locker, he would have known what they were for. The defendant went into the storage facility with his son on August 7, possibly to locker H–16. He went again to locker H–16 just three days after search warrants were executed on the homes of co-conspirators, and he immediately and dramatically abandoned the locker when inspection revealed that the materials to make

methamphetamine (but not the domestic items) had been removed.

There was also substantial evidence from which the jury could have found that the defendant facilitated the goals of the conspiracy by allowing materials which he knew were for the manufacture of methamphetamine to be stored in a locker over which he had control during the life of the conspiracy. There was evidence for his control of the locker. The rental agent described the man who had rented the locker as having the same general characteristics as the defendant. A handwriting expert testified that the defendant probably had signed and initialed the lease. One of the contact telephone numbers on the lease was one the defendant had used in the past. That telephone number was listed at an address on Hoffman Street in Philadelphia where the defendant had once lived. At the time of the conspiracy, two automobiles were registered to Adrian Mastrangelo at the Hoffman Street address. They were seen parked on Neshaminy Valley Drive, across the street from the apartment in which the defendant was living, and he was seen driving one of them. The address given for the elusive renter, Raymond Burgos, was in the same apartment complex. The locker appeared to have been rented so as to hide the identity of the renter. Finally, there was the videotaped evidence that the defendant had keys to the storage locker and evidently knew the access code to the facility. This evidence, taken as a whole and viewed in the light most favorable to the government, is sufficient to support a finding beyond a reasonable doubt that the defendant controlled the locker in which materials for the conspiracy were stored and that he attempted to hide the fact that he had rented it.

In addition, there was evidence that the defendant facilitated the conspiracy in another way: by assisting his son in transporting the government methylamine to the storage locker on August 7, 1993. The son appeared to be suspicious of the surveillance van in front of Garage G, and father and son took what appeared to be counter-surveillance activity on the way to the storage locker. While this evidence may not have been sufficient to support the defendant's participation in the conspiracy by itself, it is another piece that goes to make up the total, and I must determine "whether all the pieces of evidence against the defendant, taken together, make a strong enough case to let the jury find him guilty beyond a reasonable doubt." *Coleman*, 811 F.2d at 807 (quoting *U.S. v. Allard*, 240 F.2d 840, 841 (3d Cir.), *cert. denied*, 353 U.S. 939, 77 S.Ct. 814, 1 L.Ed.2d 761 (1957).

Finally, there was substantial evidence of the defendant's preparation for flight after the residences of co-conspirators were searched and he found the storage locker had been emptied, and of his subsequent disappearance.[4] The defendant started to transfer his assets the same day he discovered the materials had been removed from the storage locker; his telephone was cut off shortly after the discovery; and by the time the indictment issued, the defendant had dropped out of sight. He thereafter discussed surrender with an attorney, but did not surrender, and had to be tracked down. This flight, and the preparation for it, may be taken as evidence of the defendant's guilt.

I conclude the evidence that the defendant knew of the conspiracy and its goals and knowingly facilitated those goals in one or more ways during its lifetime is sufficient to support the jury's finding that, beyond a reasonable doubt, the defendant was willfully a member of the conspiracy, that he shared in the "unity of purpose" of his co-conspirators. The evidence supports the finding that the defendant knowingly allowed a storage locker over which he had control to be used to store materials for the conspiracy; the evidence that he knowingly helped his son transport the government's methylamine to storage locker H–16 strengthens that find-

---

**4.** To be evidence of guilt, the flight does not have to occur immediately after the crime; it can be at another time when the defendant has reason to fear apprehension, such as after indictment or after someone who could implicate the defendant in a crime has become a government witness. *U.S. v. Pungitore*, 910 F.2d 1084, 1151 (3d Cir. 1990), *cert. denied*, 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991).

ing.[5] After reviewing all the evidence in the light most favorable to the government, in answer to the question "whether all the pieces of evidence against the defendant, taken together, make a strong enough case to sustain the jury's finding of guilt beyond a reasonable doubt," I conclude that they do. *U.S. v. Coleman,* 811 F.2d 804, 807 (3d Cir. 1987).

## 2. Outrageous Conduct of the Government.

The second ground the defendant offers for acquittal is that the indictment should have been dismissed because of the government's outrageous behavior. This argument was presented in a pre-trial motion. A decision was postponed until all evidence was presented at trial, but the motion was not decided. I now rule that the government's behavior was not of such a nature as to require dismissal of the indictment. The outrageous conduct on which the defendant bases this part of his motion for acquittal is two-fold: the government's handling of the evidence and its testimony before the Grand Jury.

### a. Loss or Destruction of Evidence.

First, the defendant argues that the government's loss or destruction of many items of physical evidence violated his due process rights in that he was unable to examine them and determine their exculpatory value. I will now consider my ruling above in light of Supreme Court decisions setting out the test to apply in determining whether the failure to preserve evidence rises to a due process violation.[6] *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The test was devised in the context of the government's deliberate destruction of evidence, but it can also be considered with respect to its loss of evidence in that there

was a failure to preserve evidence the defendant claims is important to his defense.

Most importantly, the destruction of the evidence must be in bad faith. In *Trombetta,* arresting officers failed to preserve breath samples from people they suspected of drunken driving once breath analysis tests of the samples had been completed. The Court noted that

> authorities in this case did not destroy respondents' breath samples in a calculated effort to circumvent the disclosure requirements established by Brady v. Maryland and its progeny. In failing to preserve breath samples for respondents, the officers here were acting "in good faith and in accord with their normal practice." The record contains no allegation of official animus toward respondents or of a conscious effort to suppress exculpatory evidence.

*Trombetta,* 467 U.S. at 488, 104 S.Ct. at 2533 (citation omitted). It went on to elaborate the circumstances in which bad faith could be inferred:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* at 488–89, 104 S.Ct. at 2534 (citation and footnote omitted). The *Youngblood* Court stated, "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was destroyed." 488 U.S. at 56 n. *, 109 S.Ct. at 336 n. *.

---

5. It is true that, as the defendant points out, he appeared to have had no contact with members of the conspiracy other than his son, but it is not necessary that he conspire with more than one other person. *U.S. v. Kelly,* 892 F.2d 255, 259 (3d Cir.1989), *cert. denied,* 497 U.S. 1006, 110 S.Ct. 3243, 111 L.Ed.2d 754 (1990).

6. At no time does the defendant cite any facts indicating that the items lost or destroyed by the government would have provided exculpatory evidence. If he had, I would review the matter under the standard of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Youngblood* made clear that, even if the evidence had potential exculpatory value for the defendant, its destruction did not violate due process unless it was destroyed in bad faith.[7] In the case, the defendant, Youngblood, was accused of molesting and sodomizing a 10-year old boy. At the hospital, the treating physician collected evidence, including a rectal swab, and the boy's clothing. 488 U.S. at 52–53, 109 S.Ct. at 334–35. While both were later found to contain semen, the test results were inconclusive because the evidence had not been tested promptly and the clothes had not been refrigerated. *Id.* at 53–54, 109 S.Ct. at 335. The defendant, who maintained the boy had erred in identifying him, claimed that the police had allowed the exonerating semen samples to be destroyed by failing to test them sooner or to preserve them properly. *Id.* at 54, 109 S.Ct. at 335.

The Court stated that the failure of the police to refrigerate the clothing and to perform the tests promptly "can at worst be described as negligent," and that there was no suggestion of bad faith on the part of the police. *Id.* at 58, 109 S.Ct. at 337. Therefore, there was no due process violation.

The defendant in this case, in his motion to dismiss the indictment, lists the following items that were lost, destroyed or broken by government agents and that he therefore he could not obtain:

1. The methylamine used in the reverse sting was lost by the government in the sense that its agents did not have certain knowledge of its whereabouts at all times and failed to recover three of the four bottles.

2. Several pieces of glassware, which allegedly had traces of methamphetamine, were broken beyond repair.

3. A glass funnel that allegedly had the defendant's fingerprint on it was broken.

4. Many of the materials and much of the laboratory equipment was destroyed or broken by the government. Special Agent De-Hart testified that many of the items seized from storage locker H–16 and photographed were destroyed. They were turned over to a hazardous waste company for disposal, in accord with the usual practice of the DEA, which was designed to protect the agents and the environment. Those items included the lye, aluminum foil, muriatic acid, hydrochloric acid, empty grain alcohol bottles, and other materials.

The defendant has failed to meet the requirement for dismissing an indictment set out in *Trombetta* and *Youngblood* that the evidence must have been destroyed in bad faith. Both sides cite *U.S. v. Cooper*, 983 F.2d 928 (9th Cir.1993), in which an indictment was dismissed for the government's bad faith failure to preserve laboratory equipment seized from the defendants because it violated due process. In *Cooper*, the government had charged the defendants with using their laboratory to make methamphetamine. The defendants had an alternative explanation of the use to which they had put the laboratory, but they could demonstrate it only if a certain piece of evidence seized by the government were preserved. The government knew that the company to which it had given the evidence for disposal would keep it for only a short time unless the government directed that it be stored. When the defense attorney reiterated the importance of the evidence and demanded its return, the government agent responded that it was being held as evidence, even though he knew it would be destroyed. *Id.* at 930–32. The government agent continued to tell the defense that the item was being stored even after he knew it had been destroyed. Under those circumstances, the Third Circuit concluded the item had been destroyed in bad faith.

---

**7.** The *Youngblood* Court noted that different tests were applied under the Due Process clause when dealing with the loss or destruction of evidence and with the failure to disclose exculpatory material. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Griffin v. Spratt*, 969 F.2d 16 (3d Cir.1992). Under *Brady*, the suppression of exculpatory evidence is a violation of due process irrespective of the good or bad faith of the prosecution. *Youngblood*, 488 U.S. at 57, 109 S.Ct. at 337. In contrast, the *Youngblood* Court held that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. at 337.

In this case, the only evidence that was deliberately destroyed was some of the material in storage locker H–16. The government destroyed it after photographing it, in accord with the usual procedures of the DEA. As the Third Circuit noted in *U.S. v. Deaner*, 1 F.3d 192 (3d Cir.1993), "We have previously held that destruction of evidence in accordance with an established procedure precludes a finding of bad faith absent other compelling evidence." *Id.* at 200 (citing *Griffin v. Spratt*, 969 F.2d 16, 21 (3d Cir.1992); *United States v. Boyd*, 961 F.2d 434, 437 (3d Cir.). *cert. denied*, 506 U.S. 881, 113 S.Ct. 233, 121 L.Ed.2d 168 (1992); *U.S. v. Stevens*, 935 F.2d 1380, 1388 (3d Cir.1991)). In *Cooper*, there was just such compelling evidence. In this case there is not. Here, the defendant has presented no evidence showing that in following well established procedures and destroying materials from storage locker H–16 after photographing them, the government acted in bad faith.

The defendant has also failed to show that the evidence possessed "exculpatory value that was apparent before [it] was destroyed." *Trombetta*, 467 U.S. at 489, 104 S.Ct. at 2534. He has not indicated how any of the lost, damaged, or destroyed evidence would be exculpatory. The defendant states that the methylamine bottle may not be one of the government's, but there is no support for that statement. The bottle was identified by Detective Clements, who testified that he put a certain mark on each bottle and pointed out the mark on the bottle that was recovered. With respect to the funnel with the defendant's fingerprint, the portion of the funnel containing the fingerprint was not broken. With respect to the other glassware, and the factory-sealed materials that were photographed and then destroyed, the defendant does not discuss an exculpatory value that was apparent before they broke en route from the government's Northeast Regional Laboratory back to Philadelphia. But even if he had been able to show that the destroyed evidence was exculpatory, the defendant could not have prevailed under the Supreme Court cases cited unless he could show that their exculpatory value was apparent at the time the items were destroyed, and that their destruction was therefore in

bad faith. As noted above, he has failed to do that.

With respect to items lost rather than destroyed, the defendant has not alleged that the losses were anything other than negligence. In *Youngblood*, the Court concluded that the failure of the police to refrigerate the victim's clothing and to perform the tests on the semen samples promptly "can at worst be described as negligent," and that would not sustain the defendant's claim of a violation of his due process rights. 488 U.S. at 58, 109 S.Ct. at 337. Neither will any loss of evidence here. Therefore, the government's loss or destruction of items of evidence in this case will not warrant dismissing the indictment.

### b. Misconduct before the Grand Jury.

 The defendant alleges the following perjured testimony and improper manipulation of facts before the Grand Jury:

1. The person who received the methylamine from Michael DeJulius and gave it to Adrian Mastrangelo, III was misidentified as Carmen Sylvester and the indictment against him was later dismissed. The government knew at the time of the Grand Jury proceedings that the person who had been misidentified as Carmen Sylvester was really Joseph Viola.

2. Detective Clements stated that Adrian Mastrangelo, Jr. resided at 1416 Neshaminy Valley Drive, which was the address give on the lease application at Four–Storage, when his address was actually 1457 Neshaminy Valley Drive.

3. There was testimony attempting to make it seem as though the defendant lived in the apartment complex adjacent to Four–Storage and that the locker was registered in his name, when neither was true.

4. Detective Clements stated that the J.T. Baker box the government provided for the methylamine was the one retrieved from storage locker H–16, but the government had lost track of the box it provided.

5. Detective Clements testified that trace amounts of methamphetamine and methylamine were found in certain containers seized

at Four–Storage, when it could not be determined when the methamphetamine residue was deposited and the methylamine bottle was not properly tested.

The government has a plausible explanation for each of these alleged misdeeds which renders them either innocent mistakes or mistaken allegations, but rather than discuss the merits of each allegation individually, I will test all of them against the doctrine of harmless error. The Supreme Court has held that "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant." *Bank of Nova Scotia v. U.S.*, 487 U.S. 250, 255, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988). Dismissal is proper "only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id.* (quoting *U.S. v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 945, 89 L.Ed.2d 50 (1986)). On the basis of the defendant's representations and submissions, I cannot find that any of these alleged misdeeds substantially influenced the Grand Jury's decision to indict the defendant or raises a grave doubt of such influence.

I conclude that none of the defendant's arguments for acquittal has merit, and I will deny his motion for acquittal.

### MOTION FOR A NEW TRIAL

With his motion for acquittal, the defendant filed a motion for a new trial based on seven different alleged errors, each of which he argues requires a new trial.

### 1. Error in Failing to Suppress Physical Evidence.

■ I denied the defendant's pre-trial motion to suppress physical evidence seized from storage locker H–16 and Garage G on Fourth Amendment grounds because I concluded he lacked standing to challenge the

seizures. The defendant would admit to no personal interest in the places searched or in the items seized. Nevertheless, he claims he has standing to challenge the seizure of physical evidence "not simply because the Government alleged that he controlled the locker or jointly possessed the locker with his son, but also because [the government alleges] he participated in the alleged organization, particularly on the day of the surveillance of the defendant going to the entrance to the storage locker." Defendant's memorandum in support of his motion at 18.

The Supreme Court has held that Fourth Amendment rights are personal, and that defendants "may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated." *U.S. v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980) (overruling *Jones v. U.S.*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) (giving those charged with possession "automatic standing" to challenge legality of a search). As the moving party, the defendant has the burden of establishing that he had a legitimate expectation of privacy in the item seized or the place searched, and he has not met his burden. *U.S. v. Gomez*, 16 F.3d 254, 256 (8th Cir.1994), citing *Rakas v. Illinois*, 439 U.S. 128, 138–44, 99 S.Ct. 421, 427–31, 58 L.Ed.2d 387 *see also* 130–31 n. 1, 99 S.Ct. at 424 n. 1 (1978).

The defendant attempts to base his standing entirely on the government's charges against him, on the fact that the government alleges that he had control of the storage locker. He assumes this allegation confers the personal interest necessary for his standing, but it does not. Since *Salvucci,* defendants cannot rest their Fourth Amendment claims on the fact that they are charged with possession of the items seized. They must show an independent basis for asserting the right of privacy, and the defendant has not done so.[8] He has therefore failed to demon-

---

8. The defendant relies on *U.S. v. Padilla,* 960 F.2d 854 (9th Cir.1992), *aff'd in part, vacated in part,* 508 U.S. 77, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993), in which the court stated: "neither ownership nor presence are required to assert a reasonable expectation of privacy under the

Fourth Amendment." *Id.* at 859. However, in such cases, some other some basis of interest must shown. For example, the *Padilla* court went on to say that, in the case before it, joint ownership and supervision of the place searched established standing. *Id.* The defendant in this

strate that he has standing to assert a Fourth Amendment claim to suppress the physical evidence seized from storage locker H–16 and Garage G.

## 2. Error in Admitting the Videotape.

■ In a pre-trial hearing, I heard evidence from two special agents and one technician who testified to the installation and operation of the recording machine and to the custody of the videotape of the defendant opening storage locker H–17 on August 7, 1993. I found the tape met all relevant technical criteria as found in *U.S. v. Starks*, 515 F.2d 112 (3d Cir.1975), and I later admitted it into evidence at trial.

The defendant alleges two types of error in my admission of the videotape, but they are combined in his presentation. He states that the court erred "in finding that the video camera was capable of accurately depicting that which was offered into evidence due to the numerous problems and difficulties that appear on this particular video in conjunction with the fact that ... the Government destroyed all videotapes ... except for the instant video." His first argument is that I erred in ruling that the tape met the technical criteria for admission under *Starks*.[9] The defendant does not, however, say in what way the tape failed to meet the criteria except to state there were "numerous problems and difficulties that appear on this particular video." That statement is insufficient to support a claim of error. His second argument is that the tape should have been excluded for non-technical reasons. The defendant points out that no reports were prepared regarding the installation of the camera or how and when the tapes were retrieved and reviewed; that the recordings the government found to be of no evidential value were not preserved and the tapes containing them were reused or discarded; and that there were other individuals depicted on some of the videotapes that were destroyed. I conclude these arguments too must fail. While there were no written reports, there was adequate testimony about the installation of the camera and the retrieval and review of the tapes. In addition, Special Agent Gobin testified that none of the other individuals recorded on the tapes entered or opened storage locker H–16. Therefore, there is no reason to think the tapes on which they appeared had any exculpatory value for the defendant.

## 3. Error in admitting Co-conspirators' Statements.

■ The defendant contends I erred in admitting tapes containing out-of-court statements made by co-conspirators pursuant to Federal Rule of Evidence 801(d)(2)(e). Those tapes were used to establish the existence of the conspiracy, which defendant does not challenge. Nonetheless, without evidence sufficient to connect him to the conspiracy, the tapes could not be admitted, and the government would have to rely on other evidence to prove the conspiracy.

Under Federal Rule of Evidence 801(d)(2)(E), one exception to the hearsay rule is a statement offered against a party that is made "by a coconspirator [sic] of a party during the course and in furtherance of the conspiracy." If the admission of such a statement is challenged, the court must determine, by a preponderance of the evidence, that the defendant is a member of the conspiracy before the statement may be admitted in evidence.[10] *Bourjaily v. United*

---

case has asserted no such personal interest in property searched or items seized.

**9.** In *United States v. Starks*, 515 F.2d 112 (3d Cir.1975), the court set out criteria for determining the technical acceptability of audio tapes. I applied the same criteria to the video tape. The criteria are as follows: (1) the recording devices used were capable of recording what was offered in evidence; (2) the operators of the devices were competent to operate them; (3) the recordings are authentic and correct; (4) there were no changes in, additions to, or deletions from the

recordings; (5) the recordings were preserved in a secure area; those appearing on the tape were identified; and (6) the recordings fairly and accurately reflect the events that occurred. *Id.* at 121 n. 11.

**10.** The defendant contends that the evidence connecting the defendant with the conspiracy must be entirely independent of the co-conspirator statements, but the Third Circuit cases he cites in support of that contention have been superceded by *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), which holds

*States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); *U.S. v. Trotter,* 529 F.2d 806, 811 (3d Cir.1976).

The government contends that, once the conspiracy has been proved, the evidence connecting the defendant to it may be slight. That is true, but it is important not to confuse the amount of evidence with the weight of that evidence and the standard of proof. Referring to the district court's determination that the statements of co-conspirators could be admitted in evidence, the United States Court of Appeals for the Third Circuit stated:

> In this circuit, we have held that the government generally must establish the existence of the alleged conspiracy and the connection of both the hearsay declarant and the defendant to the conspiracy by a preponderance of the evidence prior to the admission of the statement.... The necessary quantity of evidence to show participation need not be great; we have previously held that the trial judge's determination need only be supported by "slight" evidence.

*U.S. v. Castro,* 776 F.2d 1118, 1126 (3d Cir. 1985). Thus, while quantity of evidence on which the connection is based may be slight, the government still has to prove the connection by a preponderance of the evidence. The government presented more than a slight amount of evidence linking the defendant with the conspiracy. The question is whether it succeeded by a preponderance of the evidence.

The defendant does not challenge that the statements the government wished to introduce were made during the conspiracy and in furtherance of it. He simply maintains that there is no evidence linking him to the conspiracy, and therefore the evidence cannot be admitted. In responding to the defendant's motion for acquittal, I reviewed the evidence that supported the jury's finding that the defendant was guilty of conspiracy. That same evidence supports my conclusion that

the government met its burden of proving, by a preponderance of the evidence, that the defendant was linked to the conspiracy. I will therefore deny this part of his motion for a new trial.

### 4. Error in Admitting Evidence of Other Crimes.

■ The defendant contends I erred in ruling to admit evidence of other crimes. Federal Rule of Evidence 404(b) provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident....

Fed.R.Evid. 404(b). In addition to being offered for a proper purpose, the evidence must be relevant and its probative value must not be substantially outweighed by its prejudicial value. Fed.R.Evid. 402, 403; *Huddleston v. U.S.,* 485 U.S. 681, 691, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988).

■ The government proposed to introduce evidence of several past convictions and evidence of a search of the defendant's residence in which materials consistent with the operation of a clandestine methamphetamine laboratory were found. It offered this evidence for numerous purposes: knowledge, intent, absence of mistake or accident, and identity. I decided to allow evidence of one prior conviction for one purpose only: the defendant's knowledge of what was involved in making methamphetamine.

I found that evidence of the defendant's knowledge of and familiarity with the numerous ingredients and pieces of equipment needed for the manufacture of methamphetamine was essential to the government's case.[11] The defendant could not be found to

---

that a co-conspirator's statements can be used to establish the defendant's participation in the conspiracy. *Id.* at 180, 107 S.Ct. at 2781. In this case, however, the tapes were not used for that purpose.

11. The conviction was for conspiracy to manufacture methamphetamine, and while such a conviction does not necessarily mean that a defendant has extensive knowledge of the ingredients or equipment used, the jury could infer from it that the defendant had sufficient knowledge of

be a member of this conspiracy if he did not know that the purpose of the conspiracy was the clandestine manufacture of methamphetamine.[12] The government had to present evidence from which the jury could infer that the defendant knew the methylamine or other materials assembled were meant for the clandestine manufacture of methamphetamine to show that he was a member of the conspiracy. None of the other evidence could support such an inference. I balanced the probative value of the evidence against the prejudicial value, and decided that while the prejudicial value was great, it did not substantially outweigh the probative value of the 404(b) evidence, which was very great. Indeed, the evidence was essential.

In an effort to avoid the prejudicial effects of the 404(b) evidence, I followed the suggestion of Judge Becker in *U.S. v. Jemal,* 26 F.3d 1267, 1274 (3d Cir.1994) and explored with the parties the possibility of fashioning a stipulation that could provide the essential information as to the defendant's knowledge and thereby avoid admission of the 404(b) evidence.[13] I helped them craft a stipulation that both sides accepted.[14] Thereafter, I refused to admit the 404(b) evidence and the defendant preserved no objection to its admission. The government still wanted to introduce evidence of prior crimes to show intent, but I concluded that using such evidence to show intent would be indistinguish-

able from using it to show propensity to commit the crime or bad character.

### 5. Error in Admitting Evidence of Traces of Methamphetamine.

██ The government introduced evidence that, in laboratory analysis, it had found trace amounts of methamphetamine in items from storage locker H–16 that were later damaged or destroyed. Government experts testified that the trace amounts were probably the residue from a manufacturing process, although they could not say when the residue was deposited. The defendant contends that, therefore, the government cannot connect the residue to this conspiracy, and its admission was improper, going only to show propensity.

The government states that its evidence went to show that the material stored in locker H–16 was a "boxed methamphetamine laboratory." The presence of the methamphetamine residue strengthens that claim, regardless of when the traces were deposited. It can therefore be introduced for the proper purpose of showing that the person who controlled the locker had the ability, rather than the propensity, to manufacture methamphetamine, or knew those who could manufacture it. It can also be introduced to show absence of mistake. The items in the locker were not an accidental collection of items, but were ones that had been collected

what went into its manufacture to recognize the significance of methylamine or the items stored in locker H–16. The defendant was also charged with attempt to manufacture methamphetamine. Knowledge was more directly relevant to that charge.

12. Convictions that were overturned because the government's case lacked such evidence include *Samuels, Wexler,* and *Cooper.*

13. The defendant cites *Jemal* for his argument that he can avoid introduction of the evidence to prove knowledge if his defense is that "he did not do the charged act at all." 26 F.3d at 1273. But that was not the holding of *Jemal;* it was merely an example of a Second Circuit rule that district courts should not admit evidence of prior bad acts to prove knowledge or intent if the defendant had taken sufficient steps to remove the issue from the case. *Id.* at 1273. The *Jemal* court noted that the circuits were split on the question, and concluded that prior Third Circuit

precedent "would seem to prevent us from adopting the per se rule of the Second Circuit." *Id.* at 1274. In *Jemal,* the question was whether the defendant's proffered stipulation was adequate to prevent the introduction of 404(b) evidence. The court emphasized that "to succeed, the defendant's proffer must be comprehensive and unreserved, completely eliminating the government's need to prove the point it would otherwise try to establish using the 404(b) evidence." *Id.* There was no suggestion that he could prevent the introduction of the 404(b) evidence without the stipulation, simply by taking the position that "he did not do the charged act at all."

14. The stipulation stated:

It is hereby stipulated and agreed by and between the United States of America and Adrian Mastrangelo, Jr., through his attorney, that as of July, 1993, Adrian Mastrangelo, Jr. had the chemical background to know the ingredients and equipment necessary to make methamphetamine.

for the purpose of making methamphetamine. The admission of the evidence was therefore proper. It is true that the residue of methamphetamine does not link the items in the storage locker or the person who controlled the locker with this conspiracy, but that connection is shown by other evidence: the presence of the J.T. Baker box with the government's empty methylamine bottle in it.

### 6. Error in Admitting Photographs of Items Later Destroyed.

■ Many of the items seized from the storage locker were photographed and then destroyed, pursuant to the policy of the DEA. The materials, which were not tested before their destruction, were labeled as muriatic acid, lye, aluminum foil, and grain alcohol. The defendant contends the photographs should not have been admitted into evidence on the ground that they are hearsay evidence and do not fall under one of the exceptions to the admission of such evidence enumerated in Federal Rule of Civil of Evidence 803.

If the government had introduced the photographs to show that the containers that were destroyed unopened and were labeled "lye" or "muriatic acid" or "aluminum foil" actually contained those substances, the evidence would be hearsay; but they not introduced for that purpose. Instead, the government introduced them to show the intent or state of mind of the co-conspirators who collected and stored them, including that of the defendant: to assemble what appeared to be the materials needed to make methamphetamine. The photographs are therefore not hearsay.

### 7. Error in Failing to Declare a Mistrial.

The defendant called for a mistrial because of the prosecutor's remarks about the stipulation in her closing argument. She said:

When I opened, I told you I was—I told you what I was going to prove and I said and there will be more. And what more did I prove to you? The stipulation. The defendant has the chemical background to know the ingredients and equipment necessary to make methamphetamine.

There is no evidence concerning anyone else involved in this conspiracy whether known or unknown—

Notes of Testimony, vol. 13 at 60. I sustained the defendant's objection and gave the following curative instruction:

The parties stipulated that the defendant had the chemical background to make methamphetamine. The Government, Ms. Howard, in its closing, made reference to the fact that there was no evidence presented that anyone else had this chemical background and that therefore by inference the defendant, since he possessed this knowledge, must necessarily have been the maker.

Such an inference is improper and should be stricken from your minds. There was no burden on the defense to produce evidence that no one else did or did not possess chemical knowledge to make methamphetamine.

Furthermore, there is no evidence in this case that no one else did not have the knowledge to make methamphetamine.

*Id.* at 80–81. On rebuttal, the government again suggested that the defendant's stipulated knowledge of chemistry made him the likely candidate for the person who made the methamphetamine:

Now, Mr. Patrizio [counsel for the defendant] said that we all could leave here now and go out and make methamphetamine. If you recall what Mr. Fasanello [government expert witness on the manufacture of methamphetamine] said, he said, yeah, you could out [sic] and make it, now that I've explained it to you, but what would be the quality? ... It's just like saying to someone, I'm going to tell you now the ingredients that you need to bake a cake, and someone lists all of the ingredients. But unless you know when to add what, how much to add, and what to do, you might get a cake by putting all of those things together. The question is, is it edible. And that's the difference between your knowing now what the ingredients are and how to make a cake, than someone who had the chemical background to know the ingredients and equipment necessary.

*Id.* at 183. The defense objected and moved for a mistrial, which I denied.

■ There is no question that the prosecutor's remarks were improper. The stipulation stated only that defendant had the chemical background to know the ingredients and processes in the manufacturer of methamphetamine. The prosecutor used this to suggest that, because there was no evidence that anyone else in the conspiracy had such knowledge, the defendant must be the one responsible for the manufacture of the methamphetamine. In deciding whether these remarks warrant a new trial, I have to ask whether they created a probability of prejudice to the defendant that was not neutralized by my instructions. The question is whether the remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986).

While I conclude that my curative instructions were sufficient to counteract any prejudice in the minds of the jurors, there is a better indication of lack of prejudice: the jury's verdict. The prosecutor's remarks went to Count 12, attempt to manufacture methamphetamine, rather than to Court 2, conspiracy to manufacture methamphetamine, and the jury acquitted the defendant of Count 12. Therefore, the jury clearly was not persuaded by the prosecutor's improper suggestion that, since no one else was shown to have the requisite knowledge to manufacture the methamphetamine, the defendant must have been the one who attempted to make it.

I conclude that none of the errors the defendant alleges warrants a new trial and therefore I will deny his motion for one.

## CONCLUSION

For reasons that appear above, the defendant's motions for acquittal or, in the alternative for a new trial, are denied. An appropriate order follows.